For the purpose of widening Washington street the city of Newark condemned the two four-story stores at the northwest corner of Market and Washington streets, Newark, and paid the award into court, $479,550. Both buildings were taken and razed, although only half the land was taken, that which lies southeasterly of a line extending from the northerly corner of the lot on Washington street to the westerly corner on Market street. Cook et al. are the owners in fee of a two-thirds undivided interest, and the holders of a tax title (called that for convenience) for the term of two hundred years, expiring in August, A.D. 2057, of the remaining one-third, the fee of which is in Charles A. McEuen. There are numerous claims upon the fund by a tenant and sub-tenants, and by McEuen, who takes the position that the tax title is invalid for irregularities in the proceedings on which it is based, and for fraud in its procurement, and that the court in these proceedings may hold it to be of no effect.
The title in 1850 was in one Leavitt, who conveyed an undivided two-thirds interest to Charles H. Sherman and a one-third to McEuen and his brothers and sisters, by separate deeds, February 13th, 1850. McEuen succeeded to his brother's and sister's interest by inheritance. Title to the Sherman two-thirds' interest passed to William H. Sherman and by mesne conveyances to Nehemiah Perry, and from Perry to Martin Burne in 1866. About the same time Burne acquired the tax title. Burne remained in possession until his death in 1912, and Cook et al. hold by devise from him. On August 24th, 1857, the property was sold by the city of Newark for an unpaid sewer assessment to John R. Weeks *Page 529 
for two hundred years. He assigned to Perry and Perry to Burne. At the time of the assessment and sale the fee was in Abraham H. Sherman (who was also in possession) and the McEuen children, then infants. The assessment map designated Abraham H. Sherman as the owner of the lot; the McEuens were not parties to the proceedings. The deed to the McEuens did not come to their knowledge until 1869, and in 1870 they brought an action in the supreme court against Burne to recover possession of their interest, and judgment was rendered against them. The "phonographer's" transcript of his notes of the trial at the September term, 1870, of the Essex circuit, is in evidence, without objection, and from it it appears that Abraham H. Sherman, the co-tenant of the McEuens, furnished Weeks, the purchaser of the tax title, with the purchase price the day after the sale, and that Weeks, at the instance of Sherman, assigned the certificate of sale to Perry in 1861, who assigned it to Burne in 1866. Mr. Justice Depue, presiding, held the certificate of sale to be in due form, and that the proceedings upon which it was founded could not be attacked collaterally, but only on review by certiorari as provided by the then recent act of 1869, now section 15 of the Sale of Lands act (Comp. Stat. p.4679); that the question of fraud, because Sherman procured the tax sale to Weeks instead of paying the assessment, or of a resulting trust, because the purchase price was paid by Weeks, the co-tenant, was cognizable only in equity, and left to the jury the single question whether the money was furnished by Sherman to Weeks to procure the certificate of sale, or paid to him to satisfy and extinguish the tax title, and, if the latter, they must find for the plaintiff; and the jury found that it was not so paid. Nothing further was done until just before the award in these proceedings (1925), when McEuen applied to the chief-justice for a writ of certiorari, and, being refused, applied to the supreme court, and upon denial on the ground of laches (In re McEuen, 4 N.J. Adv. R. 548) appealed to the court of errors and appeals, where it is now pending. *Page 530 
If by the tax sale McEuen's property was taken without due process of law, i.e., without notice, and, consequently, in violation of his constitutional rights to be heard, as he claims, his remedy is by certiorari. This objection to the tax sale would have been available in ejectment before the act of 1869, which made it reviewable by certiorari only. Baxter v.Jersey City, 36 N.J. Law 188. The act did not, as suggested, deprive him of his remedy by ejectment; it simply regulated the legal steps to the remedy. Bozarth v. Egg Harbor City,85 N.J. Law 412. If McEuen is entitled to relief in these proceedings it cannot be granted until the certificate of sale is invalidated bycertiorari. Until then it must be taken at its face value. The act applies as well to this court as to the courts of law. Jurisdiction to set it aside is exclusively in the supreme court.Nugent v. Hayes, 94 N.J. Eq. 305; Sutton v. Maurice RiverTownship, 93 N.J. Eq. 484. McEuen's right to a review bycertiorari, for invasion of his constitutional rights, was co-extensive with his right of action in ejectment, limited by statute to twenty years. Comp. Stat. p. 3169. It was not abridged by later legislation reducing the time to three years and now to eighteen months. Comp. Stat. p. 254; Groel v.Newark, 78 N.J. Law 142. The refusal of the supreme court to grant the writ on the ground of laches is not, as counsel states in his brief, "an invitation" to equity to intervene, and it does not argue that this court has complete jurisdiction to hear the controversy, because in this particular case the law has proved "deficient." The law is simply unwilling. Equity has jurisdiction in cases where the law cannot, not where it can, but will not, grant relief.
McEuen is in no better position on the purely equitable grounds of fraud of his co-tenant in procuring the tax title to another, or of resulting trust because the purchase by his co-tenant inured to his benefit. Weller v. Rolason, 17 N.J. Eq. 13. The only evidence offered to sustain the charge of fraud or the claim of a resulting trust is the transcript of the testimony taken at the trial of the ejectment suit, and McEuen's offer to testify to what occurred — that is, to repeat *Page 531 
what appears by the transcript to have taken place, and the check of Sherman to Weeks of August 26th, 1857, for $178, the amount of the assessment. It was there proved that Sherman supplied Weeks with the purchase-money for the sale certificate. Though the transcript was admitted in evidence without objection, it is without legal effect. It has no place in our law of evidence as an official document and is without probative value. Its recital of legal testimony in that suit is but hearsay testimony here. And even if the transcript were treated as verity, as establishing the fraud or resulting trust, the charge could not be entertained. McEuen's claim to relief in this respect rests upon a latent equity, enforceable, if timely pursued, but not if it appeared that Burne was a purchaser for value without notice.Bridgewater v. Ocean City Asso., 85 N.J. Eq. 379; affirmed,88 N.J. Eq. 351. It is too late to press it now. He slept on his rights too long before asserting the fraud or the equity against Burne or those who succeeded to the title, after he was fully apprised of his legal and equitable rights by Mr. Justice Depue fifty-six years ago. The proofs in the case are buried. The witnesses have all passed on — all but McEuen. Their tongues are stilled and his voice is too feeble to be heard.
McEuen is the owner of the reversion and the right to repossession one hundred and thirty-two years hence. Its present value has been calculated at $46.85, and that sum, subject to correction, is awarded to him.
Cook et al. advance the proposition that the tenants are not entitled to compensation because of the provisions of section 31 of the Landlord and Tenant act. Comp. Stat. p. 3078. "That whenever any building or buildings erected on leased premises shall be injured by fire without the fault of the lessee, the landlord shall repair the same as speedily as possible, or, in default thereof, the rent shall cease until such time as such building or buildings shall be put in complete repair; and in case of the total destruction of such building or buildings by fire or otherwise, the rent shall be paid up to the time of such destruction, and then and from thenceforth the lease shall cease and come to an end; provided, *Page 532 
always, that this section shall not extend to or apply to cases where the parties have otherwise stipulated in their agreement of lease." By this enactment the harsh common law rule that the tenant continued bound by his lease though deprived of its benefits, was abrogated and a more equitable one substituted; that in the event of the destruction of the building by fire, or by any other means as effectual, whereby the tenant lost the enjoyment, the term should come to an end and both landlord and tenant relieved of their obligation one to the other (Carley v.Liberty Hat Manufacturing Co., 81 N.J. Law 502), and having regard for the mischief aimed at and giving to "otherwise" the liberal construction to which it is entitled in this remedial legislation, it cannot be seriously questioned that destruction by condemnation is included within the spirit and letter of the statute, and terminates the relation of landlord and tenant. That is, however, as far as it goes, and it does not concern us in these proceedings. The act operates inter sese and does not disturb the rights of tenants to recover compensation from others for the loss of their estates taken from them by condemnation. If the city had taken them by unlawful methods the tenants would have had a direct cause of action against it, and, having taken them by lawful means and shifted the obligation to the award paid into court, and though the issue now relates to the portions due the tenants, the recovery, in effect, will be from the city of Newark. The award was for the value of the property as a whole; what is left after satisfying the outstanding terms represents the value of the fee.
The buildings were under lease to the Surety Realty Company for twenty years, expiring April 1st, 1930. They were sublet in parcels: Liggett Company, druggists, had the corner store and basement; McDonald Company, shoes, the store and basement adjoining on Market street, and the second floor of both buildings; John Harrington, billiard parlor, the third and fourth floors of both buildings; Ace Radio Shop, two stores on Washington street (one known as the restaurant), and the roof was rented for advertising signs. *Page 533 
The lease held by the surety company was made by Martin Burne to Sebastian A. Kresge for the term of twenty years, from April 1st, 1910, at a yearly rental of $18,000 for the first ten years and $19,000 for the remaining ten, the tenant to make repairs, pay water rates and any increase in insurance rates caused by tenants' improvements. The actual yearly yield from the sub-lessees for several years prior and up to October 1st, 1925, was —
Louis K. Liggett ................. $15,000 (leased to April 30, 1930)
R.E. McDonald, Inc. .............. 19,000 (leased to April 30, 1930)
Radio Shop ....................... 2,100 (leased to Sept. 15, 1926)
Billiard parlor, 3d floor ........ 1,500 (monthly tenancy)
Billiard parlor, 4th floor ....... 1,100 (monthly tenancy)
Roof ............................. 1,200 (monthly tenancy)
Restaurant ....................... 900 (monthly tenancy)
 _______
Total rental income ............................................. $40,800.00
 DISBURSEMENTS.
Rent to Burne estate ............................... $19,000.00
Average carrying charges based upon charges
 for four years next preceding 1926 ............... 2,063.82
 __________
Total carrying charges ......................................... 21,063.82
 _________
Net profit per year ............................................ $19,736.18

The correctness of these figures of income, and that they represented the fair annual market value, is not disputed, nor is there any protest by the owners against measuring the value of the leaseholds based upon them, but, large as they are, they deserve to be increased in respect of the third and fourth floors and the restaurant store, which were under monthly tenancies, and which, it appears, could have been let upon better terms on lease for the balance of the term had it not been for the impending condemnation proceedings. It is well recognized that assurance of a long term commands a better price. It is the testimony that the third and fourth floors have a rental value, on long term leases, of from $2,800 to $5,500 per year, and that the tenant Harrington had offered $5,000 but was refused. Making due allowance for the partisanship in expert testimony, the things reserved in *Page 534 
the offer, and for the difference between expectation and realization, the amount is fixed at $4,000; and for the same reason the restaurant, which was rated at from $3,750 to $5,250, is fixed at $4,000. The surety company has a reversionary right to the Radio shop (10 x 18) on Washington street. The rent ($2,100) for this tiny place was all the traffic would stand. The owners' single objection is that, as against annual rentals, there should be charged, approximately, $3,000, because in the income tax for some years an item of $2,080 was listed for salary to Mr. Kamm, the president of the company, and another for $960 for improvements. The company belongs to Mr. Kamm and he is entitled to all its income, and whether he takes it by way of salary or income is immaterial, and as to the improvement there is no likelihood of a recurrence. The total annual net profits, and which are found to represent the annual value of the lease, amount to $24,236.18. The market value of the lease for the unexpired term, calculated according to the rule laid down inHolcombe v. Trenton White City Co., 80 N.J. Eq. 122; affirmed,82 N.J. Eq. 364, following West Jersey Railroad Co. v.Thomas, 23 N.J. Eq. 431, that "the true method of calculating the value of an unexpired lease is not by ascertaining the yearly rental value and then multiplying the figures by the number of years the lease has to run, but by calculating its value by the annuity tables — that is, by multiplying the annual value by the value of one dollar per year for the number of years in the unexpired term," and at the present value of a dollar for four and a half years at six per cent., viz., $3.84, equals the sum due and allowed to the Surety Realty Company, subject to correction, $93,065.93. Upon first blush this seems disproportionate to the amount of the award, and it is suggested by the owner that a more equitable solution would be to pay the tenant the interest on the award, as it accrues, during the four and a half years of its term, and the tenant seems not to look upon it with disfavor if the owner will add to that sum the value of the half of the lot remaining, which, it was testified, is $265,000, and which, it is asserted, was recently sold for $300,000, but the *Page 535 
owner fails to justify his proposed course upon principles or authority. Though the allowance seems high, the rental value was, no doubt, an important factor in the award, and is reflected in the enormous sum awarded. The interest on the award, plus the interest on the amount of the value of the remaining land, exceed the net rental value of the property by a substantial sum.
As to the claim of Liggett Company, McDonald Company and the Radio Shop, it would appear that they are paying peak prices. There is testimony that leases of other stores could be had, and of the prices asked, all of which were higher than the rentals these tenants were paying, but there are such marked differences in the structures, locations and circumstances generally from the demised premises that comparative figuration is of little or no value to the court and of doubtful aid to the experts in forming their opinions. Their opinions were chiefly based on the "asking" price, none on the "bidding" price, none on vacant stores or those about to be vacated, but on places with a going business, some involving bonuses for their surrender, some not for the stores only, but for the business as well. The leased premises are in the business zone of the "Four Corners," two blocks away from the centre, desirable and in ready demand, no doubt, at prevailing rates, and, perhaps, at a premium in some instances because of the limited supply, but it is questionable whether any of the leases could be sold for more than the rent reserved. The trade would not warrant it, nor hardly the rent the tenants were paying. Liggett Company, with their almost perfect business organization and heavy capital investment, were able to make an annual profit of only $5,000, and McDonald Company had a deficiency in the last two years, which, perhaps, may be accounted for, as they tried to, by sacrificial sales of stock in contemplation of closing out, and "milking" by their Boston supply house. The good-will of a stand often plays an important part in rental value, but it cannot be said for either concern that theirs made any contribution in this respect. Liggett 
Company and McDonald's expert, Mr. Maier, gave as his opinion that *Page 536 
the rental value of Liggett's store was $26,400 per annum — $800 per front foot, with an additional fifty per cent. for corner influence, and that McDonald's was $38,956.73, or more than double the rent reserved, and offered plausible explanations and reasons, but it is difficult to share in his confidence and to accept his judgment, and it is thought that the more conservative and dependable figures of Mr. Berry, called by the surety company, and Mr. Houston, called by the owners, more nearly approximate the true value. They estimate the fair rental value of the Liggett store at $15,400, or $700 a front foot, and the McDonald store and upper floor by Berry at $19,300, or $500 per front foot, and by Houston at $17,000; the latter is, apparently, of the opinion that the McDonald rent was excessive. The slight excess of $400 in one case and $300 in the other in rental values over the rent reserved does not warrant an allowance, because it would be consumed in broker's commissions in the event of a sale.
Liggett Company argue, in support of Mr. Maier's opinion of the rental value of their lease, that the Washington street side of their store was a continuous show window seventy-four feet in length; that the opinions of real estate agents were that Washington street frontage was worth $300 per foot, adding an additional fifty per cent. for the fifteen feet nearest Market street, and that this, multiplied by the number of feet, street length, made the total $24,500. This is ingenious but not sustainable. The testimony is that the $300 per foot is for store front, not show-window front.
The Liggett and McDonald leases were made in 1923, and the consensus of opinion is that there was no marked change in rental values between that time and the condemnation, and that there was no likelihood of one until the terms expired in 1930. It has not been proved that the fair market value of the leases is more than the rent reserved, and, consequently, no allowance can be made to the lessees on this score.
The remaining question is, Are the tenants entitled to compensation for the loss of their business, profits, good-will, *Page 537 
fixtures and cost of removal? The right to compensation for lands taken for public highways is purely statutory. Before the constitution of 1844 compensation was not required, and by that instrument it is provided that "land may be taken for public highways as heretofore until the legislature has directed compensation to be made." The compensation is such only as is fixed by statute, whether it be adequate or inadequate, just or unjust. Simmons v. Passaic, 42 N.J. Law 619; Hudson LandImprovement Co. v. Seymour, 35 N.J. Law 47. The condemnation was had pursuant to article 20, section 23 of the act concerning municipalities (Supp. Comp. Stat. p. 2201; amended, P.L. 1924p. 501; P.L. 1925 p. 233), which provides for "an award for said lands and real estate or right or interest therein to be taken to the owner or owners thereof." Loss of business, profits, good-will, fixtures and cost of removal and the like suffered by the tenants, obviously, are not lands or real estate, or rights or interest therein in the legal sense and not within the criterion fixed by the statute. In Freeholders of Hudson v.Emmerich, 57 N.J. Eq. 535, Vice-Chancellor Emery had before him the very question, which arose under a statute (P.L. 1888 p.397), in effect, indistinguishable from the one under consideration, in which he, in disposing of a claim for injury to a tenant's business, held — "As to the first ground, the general rule, as settled by the best authorities, is that injury to a business carried on upon the premises, either by the landlord or tenant, is not a proper element of damage. Lew. Em. Dom. 487, and cases cited. And while no reported cases in our own courts have been referred to, this rule, as I understand, has always been applied in this state. Whatever may be the rule in other condemnations, the damages to be given on the condemnation for public roads are, under our constitution, such as are fixed by the legislature. Const. art. 1 § 15; Crane v. Elizabeth
(Court of Errors and Appeals, 1882), 9 Stew. Eq. 339. In this case the award is by the act clearly limited to the value of the land and damages to the remaining land of the owner after considering the benefits (P.L. 1888 p. 400 § 6), and the damages are limited to the damages *Page 538 
done to the fee-simple, where a single assessment is made for all the owners and persons interested in any lot. This statute, as it seems to me, clearly excludes any allowance for injury to the business carried on on the premises taken, and cannot by construction be extended to such damages." See, also,Philadelphia and Camden Ferry Co. v. Inter-City L.R.R. Co.,76 N.J. Law 50. That is the law. It works hardships. The remedy lies with the legislature; the courts cannot relieve. The rule, in principle, applies to all particulars of damage set up by the tenants, including their claim for the value of the use of their fixtures during the remainder of their term, which was especially emphasized in the briefs, and their prayer to participate in the award, in which it must be presumed their losses did not figure, will be denied.