CITY OF TRENTON, PLAINTIFF-RESPONDENT, v. ISADORE LENZNER AND FREDA LENZNER, DEFENDANTS-APPELLANTS, AND FIRST NATIONAL BANK OF PRINCETON, EXR. OF THE EST. OF JOHN S. VAN NEST, MORTGAGEE, WILLIAM EARDLEY, SOL BRODER, ROY ADAMS, MICHAEL CUNNINGHAM AND FRED BARTEL, TENANTS, DEFENDANTS.

Reargued September 8, 1954—Decided November 22, 1954.

466

468

*Messrs. John A. Hartpence* and *David Frankel* argued the cause for the appellants.

*Mr. Louis Josephson* argued the cause for the respondent.

The opinion of the court was delivered by

JACOBS, J. The Appellate Division affirmed the summary judgment for the plaintiff which had been entered in the Law Division. See *City of Trenton v. Lenzner*, 29 *N. J. Super.* 514 (*App. Div.* 1954). We granted certification under *R. R.* 1:10–2.

Trenton's parking problem is a serious one and has been the subject of much concern amongst its officials and citizens. In 1948 its board of commissioners adopted an ordinance which, after setting forth that congested street parking was threatening irreparable loss in valuations and was inimical to the general welfare of the community and that it could be reduced by proper off-street parking facilities, created the Parking Authority of the City of Trenton with the powers and duties provided by *L.* 1948, *c.* 198 (*N. J. S. A.* 40:11A–1 *et seq.*). Immediately after its creation, the Authority

began inquiry into the feasibility of establishing new parking facilities within the city. In 1950 it sought to determine the best mid-city site for the creation of a ramp-type garage—the site recommended was Lenzners' property located on East Hanover and Academy Streets and operated by them as a parking lot. Apparently the same site had been recommended earlier by the planning board. An engineering firm specializing in ramp construction submitted drawings and approximations of costs. The Authority, considering that the costs would exceed its own financial capacities, recommended that the site be acquired by the city under the authority of *L.* 1942, *c.* 138 (*N. J. S. A.* 40:60–25.1). *Cf. L.* 1949, *c.* 261 (*N. J. S. A.* 40:56–1.1).

On May 29, 1952 the board of commissioners adopted an ordinance which determined that the city acquire Lenzners' property, described by metes and bounds, by purchase or condemnation "for the purpose of making the same available to the public for the public parking of vehicles." Thereafter the Lenzners instituted a proceeding in the Law Division which attacked the validity of the ordinance and sought to set it aside. In that action the city moved for summary judgment and its motion was granted. See *Lenzner v. Trenton,* 22 *N. J. Super.* 415 (*Law Div.* 1952). No appeal was taken from the resulting judgment for the city and the Lenzners are bound by it. They are not at liberty to relitigate the issues there involved (*Bango v. Ward,* 12 *N. J.* 415, 420 (1953); *Templeton v. Scudder,* 16 *N. J. Super.* 576 (*App. Div.* 1951)); in any event, we are satisfied with the correctness of the determinations there made.

*L.* 1942, *c.* 138 expressly provides that the governing body of any municipality may, by purchase or condemnation, acquire lands for the purpose of making them available to the public for the public parking of vehicles. There is no question as to the constitutional validity of this legislation; the state has ample power to delegate to its municipal subdivisions power to take private property for public use upon the payment of just compensation. See *Abbott v. Beth Israel Cemetery Ass'n. of Woodbridge,* 13

*N. J.* 528, 545 (1953); *Borough of Little Ferry v. Bergen County Sewer Authority*, 9 *N. J.* 536, 543 (1952); *Ryan v. Housing Authority of Newark*, 125 *N. J. L.* 336, 341 (*Sup. Ct.* 1940); *Valentine v. Lamont*, 25 *N. J. Super.* 342, 347 (*App. Div.* 1953), affirmed 13 *N. J.* 569 (1953). The public use may be proprietary as well as strictly governmental in nature. *Cf. Yara Engineering Corp. v. Newark*, 132 *N. J. L.* 370, 373 (*Sup. Ct.* 1945); *Brady v. Atlantic City*, 53 *N. J. Eq.* 440, 448 (*Ch.* 1895); *Jahr, Eminent Domain* (1953), 14, 16. What constitutes a proper use will depend largely on the social needs of the times and may change from generation to generation. See *Ryan v. Housing Authority of Newark, supra; Texas Pipe Line Co. v. Snelbaker*, 30 *N. J. Super.* 171, 176 (*Law Div.* 1954); *Jahr, supra. Cf. Albright v. Sussex County L. & P. Com.*, 71 *N. J. L.* 303, 304 (*E. & A.* 1904), where Justice Dixon found occasion to remark, shortly after the turn of the century, that the scope of eminent domain had "been much enlarged in recent times to keep pace with the advance in social conditions." In the light of modern conditions, it may no longer be doubted that the maintenance of public parking facilities designed to relieve traffic congestion constitutes a proper public use. See *DeLorenzo v. City of Hackensack*, 9 *N. J.* 379 (1952); *McSorley v. Filzgerald*, 359 *Pa.* 264, 59 *A. 2d* 142 (1948); *Jahr, supra.*

While the fact that the property is actually being used for parking purposes by its private owners may have an important bearing on the amount of just compensation to be awarded, it does not limit the authority of the governing body to take it for public parking purposes. Nothing in the broad statutory language suggests any such limitation and there is no reason whatever to reach out for its implication. See *Const.* 1947, *Art.* IV, *Sec.* VII, *par.* 11; *Monmouth Lumber Co. v. Ocean Township*, 9 *N. J.* 64, 71 (1952). By taking the land the city insures not only that its future use will be public parking, but also that it will be available for the urgently needed increase of its parking facilities by the construction of a suitable ramp garage or otherwise. The fact

that the land is being taken by the city itself rather than the Parking Authority is without significance. When the statute authorizing the creation of the Parking Authority was adopted it did not repeal the pre-existing power of the city under *L.* 1942, *c.* 138, to acquire land for public parking. See *DeLorenzo v. City of Hackensack, supra.* Similarly, when the city created the Parking Authority it did not restrict its own independent power to acquire land for public parking under the terms of *L.* 1942, *c.* 138; and when it acquires such land it may itself operate the resulting parking facility or transfer it to the Authority for its public operation in accordance with the terms of the Parking Authority Law (*L.* 1948, *c.* 198), or otherwise provide in accordance with law (*L.* 1954, *c.* 205, *N. J. S. A.* 40:60–25.1) for its operation as a public parking facility. See *DeLorenzo v. City of Hackensack, supra. Cf. Camden Plaza Parking v. City of Camden,* 16 *N. J.* 150 (1954).

Negotiations for purchase having been unfruitful, the plaintiff City of Trenton filed a complaint in the Law Division, on August 4, 1953, alleging that it had determined that it was reasonably necessary to acquire by condemnation the described property of defendants Isadore Lenzner and Freda Lenzner and demanding judgment and the appointment of condemnation commissioners in accordance with *R. S.* 20:1–1 *et seq.* The defendants filed their answer which embodied various separate defenses and the plaintiff filed a reply. Thereafter the plaintiff moved for summary judgment which was heard and considered by the trial judge on the basis of the record before him which included all of the pleadings, affidavits, depositions and exhibits submitted by the parties. Finding that there was no genuine issue as to any material fact challenged and that the plaintiff was entitled to judgment as a matter of law, the trial judge on October 26, 1953 ordered the entry of judgment for the plaintiff for the appointment of condemnation commissioners to fix "the compensation to be paid for the taking of the lands, premises, property, rights and easements described in the complaint, including the damages, if any, resulting from

the taking to any remaining property." It is from this order that the defendants' appeal to the Appellate Division was taken. No question was raised before the Appellate Division or this court as to the immediate appealability of the order that condemnation commissioners be appointed. See *Bergen County Sewer Authority v. Bor. of Little Ferry*, 7 *N. J. Super.* 213, 218 (*App. Div.* 1950), appeal dismissed 5 *N. J.* 548 (1950). *Cf. In re Buckeye Pipe Line Co.*, 13 *N. J.* 385, 388 (1953).

 The appellants urge that they were improperly denied the "right to a trial." They do not suggest that they were entitled to a jury trial on the application for appointment of commissioners. See *L.* 1953, *c.* 20 (*N. J. S. A.* 20 :1–2); *In re Housing Authority of Newark*, 126 *N. J. L.* 60, 64 (*E. & A.* 1941). They contend, however, that they were entitled to present oral testimony before the trial judge and have a plenary trial in the Superior Court. *L.* 1953, *c.* 20, provides that the Superior Court shall have full jurisdiction in any action for the appointment of condemnation commissioners and "may proceed in the action in a summary manner or otherwise." The pertinent court rules (*R. R.* 4:92–1; *R. R.* 4:85–5) provide that if there is no "genuine issue as to any material fact, the court may try the action on the pleadings and affidavits, and render final judgment thereon." See also *R. R.* 4:58–3; *Taub v. Taub*, 9 *N. J. Super.* 219, 221 (*App. Div.* 1950). The finding by the trial judge that the record before him disclosed that there was no genuine issue as to any material fact was unanimously concurred in by the Appellate Division; independent examination of the record has led us to the same conclusion. Under these circumstances there can be no doubt as to the adequacy of the trial court's power to deal with and finally dispose of the matter on the application for summary judgment. See *City of Newark v. N. J. Turnpike Authority*, 7 *N. J.* 377, 381 (1951).

 The appellants contend that the city has other property available on Academy Street and elsewhere in Trenton for public parking and that there was no public

necessity for taking their particular property. In *Burnett v. Abbott*, 14 *N. J.* 291, 294 (1954), Justice Oliphant aptly pointed out that in "condemnation proceedings the quantity of land to be taken, its location and the time of taking are within the discretion of the body endowed by the Legislature with the right of eminent domain." The exercise of such discretion will not be upset by the courts in the absence of an affirmative showing of fraud, bad faith or manifest abuse. See *Burnett v. Abbott, supra; City of Newark v. N. J. Turnpike Authority, supra; Faubel v. Buckeye Pipe Line Co.*, 20 *N. J. Super.* 116, 120 (*Law Div.* 1952). Mr. Connell, executive secretary and counsel for the Trenton Parking Authority, testified at the appellants' taking of depositions, that after considerable investigation, which included reports from experts in the field, the appellants' property was determined to be the best mid-city site for the erection of a ramp type garage; that this coincided with the planning board's views; that an engineering firm specializing in ramp construction had submitted drawings and approximations of costs and that the Authority, considering that the costs would exceed its own financial capacities, had recommended that the property be acquired immediately by the city to insure that it would be used and expanded as a public parking facility. Mayor Connolly testified that the city had determined to acquire the property as a public parking area on the recommendations of the planning board, the Parking Authority and their experts, and that it planned to build a ramp-type garage. He acknowledged that the only formal action taken by the city was directed towards acquiring the property for public parking, but thought "it would be incumbent upon the city to make further use of the Lenzner property by the construction of a ramp type garage or certainly adding to the present facilities." Mr. Ortlieb, engineer of lighting and traffic for the City of Trenton, testified that there was greater need than ever before for developing off-street parking areas in Trenton; that he had recommended the acquisition of the Lenzner property for "permanent parking use"; that he considered this property more suitable for the purpose pro-

posed than other properties on Academy Street and elsewhere; and that he believed the parking facilities on the property could properly be increased by the erection of a ramp garage or otherwise. In the light of the foregoing and the absence of any material contradiction, it seems clear that there was no basis whatever for inferring that the city's determination that it was necessary to acquire the Lenzner property (though other properties were available) was in anywise tainted by fraud or bad faith or constituted an abuse of its broad discretionary powers. See *Burnett v. Abbott, supra; City of Newark v. N. J. Turnpike Authority, supra; Faubel v. Buckeye Pipe Line Co., supra.*

The appellants suggest that the city plans to acquire their property and then transfer it to the Parking Authority which will permit its operation by a private party. The ordinance of May 29, 1952 provided that the city shall acquire the property "for the purpose of making the same available to the public for the public parking of vehicles"; it is clear that the acquisition of the property is limited to the stated purpose. See *Hester v. Miller,* 11 *N. J. Super.* 264 (*Law Div.* 1951), appeal dismissed 8 *N. J.* 81 (1951). Mayor Connolly testified that the only decision actually made by the city was to acquire the property in accordance with the ordinance, and that although there had been discussions with respect to the possibility of transferring the property to the Parking Authority, no determination on that issue had ever been made. Mr. Connell likewise testified that the Authority had no assurance that the city would transfer the property to it for operation. He testified further that if the city did transfer the property to the Authority, it would consider the most feasible means of increasing its parking facilities through the erection of a ramp garage and that "if it were more economical for the Parking Authority to deal with private enterprise rather than to finance, construct, operate and maintain itself, there is no question in my mind that the Parking Authority would take that means which was most economical." After the city acquires the property the board of commissioners, in the faithful dis-

charge of its official duties and the proper exercise of its discretion, will be obliged to determine what precise manner of operation will best serve to increase the parking facilities. The city will have several alternatives within the broad statutory powers conferred by the Legislature. See *L.* 1942, *c.* 138, as amended by *L.* 1954, *c.* 205; *L.* 1949, *c.* 261; *L.* 1948, *c.* 198. These alternatives may perhaps result in private construction and operation within, however, the express terms of the pertinent legislative provisions; that fact in nowise impairs the original authority of the city to condemn the property for the purpose of making it available to the public for the public parking of vehicles. The city is at liberty to make the proper determination after it has acquired the property; that it has considered it unwise to attempt to bind a future board of commissioners by making such determination in advance in nowise suggests fraud, bad faith or abuse of its broad discretionary powers. See *Burnett v. Abbott, supra; City of Newark v. N. J. Turnpike Authority, supra; Faubel v. Buckeye Pipe Line Co., supra.* At this stage the city is clearly entitled to the presumption that its ultimate determination will be made in all good faith and will be guided solely by the proper interests of all the citizens of Trenton.

The only remaining contention which warrants discussion is the appellants' point that the city is seeking to acquire their "parking yard business" without making just compensation. The Appellate Division expressed the view that the real concern of the appellants was that the city would take their land without compensating them for the prospective loss of the profits of their business. It declined to pass on any issues relating to the proper *quantum* of the award, holding that they must await the report of the commissioners and any ultimate appeal therefrom under *R. S.* 20:1–16 and *R. R.* 4:92–6. It is at that stage that a jury trial may be demanded. *R. S.* 20:1–20; *R. R.* 4:92–6.

Under the terms of our Constitution and statutes, an owner whose property is being taken for public use must receive just compensation. *Constitution* 1947, *Art.* I, *par.* 20;

R. S. 20:1–9. See *Valentine v. Lamont, supra; Abbott v. Beth Israel Cemetery Ass'n. of Woodbridge, supra.* The measure of compensation is the fair market value. See *Ringwood Co. v. No. Jersey &c. Comm.,* 105 N. J. L. 165, 169 (*E. & A.* 1928); *Jahr, supra,* 92–101. In *Kimball Laundry Co. v. United States,* 338 U. S. 1, 5, 69 S. Ct. 1434, 93 L. Ed. 1765, 1771 (1949), the court pointed out that "value" has many meanings, that oftentimes the value to the owner differs from the value to the acquirer, but that most things have a general demand which give them a value transferable from one owner to another. Ordinarily this transferable value may be measured by the price which, in all probability, would voluntarily be agreed upon in fair negotiations between an owner willing (but not forced) to sell and a buyer willing (but not forced to buy; and it is this price which is generally said to determine the fair amount of compensation to be paid to the owner. See *East Ridgelawn Cemetery v. Winne,* 11 N. J. 459, 469 (1953); *Jahr, supra,* 100. While it has been pointed out that these concepts are somewhat indefinite, it may well be that their flexibility is the very thing which will best serve to attain the goal in eminent domain proceedings of "justice and indemnity in each particular case." See *Westchester Co. Park Comm. v. United States,* 143 F. 2d 688, 692 (2d Cir. 1944), *certiorari* denied, 323 U. S. 726, 68 S. Ct. 59, 89 L. Ed. 583 (1944).

Where land is being condemned, courts in our State and elsewhere have held that even though the taking of the land actually results in the loss of the owner's business located thereon, he is not entitled to any independent compensation for the value of the business. See *Newark v. Cook,* 99 N. J. Eq. 527, 537 (*Ch.* 1926), affirmed 100 N. J. Eq. 581 (*E. & A.* 1927); *Mitchell v. United States,* 267 U. S. 341, 345, 45 S. Ct. 293, 69 L. Ed. 644, 648 (1925); *U. S. ex rel. T. V. A. v. Powelson,* 319 U. S. 266, 282, 63 S. Ct. 1047, 87 L. Ed. 1390, 1401 (1943); *Housing Authority of City of Bridgeport v. Lustig,* 139 Conn. 73, 90 A. 2d 169 (*Sup. Ct. Err.* 1952); *Banner Milling Co. v. State of New York,* 240 N. Y. 533, 148 N. E. 668, 41 A. L. R. 1019 (*Ct. App.*

1925); 4 *Nichols, Eminent Domain* (*3d ed.* 1951), 253–259; 1 *Orgel, Valuation Under Eminent Domain* (*2d ed.* 1953), 325. In the *Banner Milling Co.* case, *supra,* the court noted that ordinarily an owner whose land is appropriated may move his business to other premises and it differentiated the specialized situation in which the condemning authority is authorized by statute to take the entire plant of a public service corporation, such as a water works, with the purpose of continuing its operation as a governmental enterprise; in this situation it is held that the plant is to be valued as a going concern. See *Nichols, supra,* 257. In the oft cited *Mitchell* case, *supra,* the United States Supreme Court upheld the denial of any independent compensation to the owner for the destruction of his business resulting from the taking of his land, even though his business could admittedly not be re-established elsewhere. See *Jahr, supra,* 157; *Orgel, supra,* 324.

Courts have recognized that the foregoing principles may operate harshly in denying to land owners reasonable compensation for their actual loss resulting from the taking of their property; and although varying justifying theories may be found in the judicial opinions, they seem far from compelling. See *Nichols, supra,* 258. More significant is the increasing tendency displayed in recent cases of giving fair and weighty consideration to the consequential loss of business as an element of the compensation rightly due to the owner. See *Kimball Laundry Co. v. United States, supra; Housing Authority of City of Bridgeport v. Lustig, supra;* 18 *U. of Chi. L. Rev.* 349 (1951); 35 *Va. L. Rev.* 1059 (1949). In the *Kimball Laundry Co.* case the United States Supreme Court held that where a laundry plant was temporarily condemned its owner was entitled to compensation for the consequential destruction of its trade routes, though admittedly the government did not directly appropriate or have any use for them. In the *Lustig* case the Supreme Court of Errors of Connecticut dealt with a condemnation report which fixed the value of the owner's poultry market building at $6,500 and then stated that if the owner

should be compensated for the building with an established poultry business therein, the fair market value of the building was $16,500. The court, in sustaining an award of $16,500, held that the owner was entitled to the fair market value of his real property and that in determining such value it was proper to consider all of the elements which an owner or a prospective purchaser could reasonably urge as affecting its fair price. In the course of his opinion for the entire court, Justice Inglis, after pointing out that the fair market value of real property should be determined in the light of the use to which it is actually being put or the use to which it could most advantageously be put, said:

"the better reasoned cases hold that, although the value of a business which is being conducted upon the real property condemned may not ordinarily be added to the market value of the realty as damages for the taking, the fact that a given business is in operation on the property should be taken into consideration in determining the market value of the real property if in truth it is a factor in establishing that market value—if, that is, the use of the real property for that purpose enhances the value of it. *Edmands v. City of Boston*, 108 *Mass.* 535, 549; *King v. Minneapolis Union Ry. Co.*, 32 *Minn.* 224, 226, 20 *N. W.* 135; *Pittsburgh, V. & C. Ry. Co. v. Vance*, 115 *Pa.* 325, 334, 8 *A.* 764; *Chairman of Highway Commission v. Parker*, 147 *Va.* 25, 29, 136 *S. E.* 496; *Voigt v. Milwaukee County*, 158 *Wis.* 666, 670, 149 *N. W.* 392. In particular, it is proper to take into consideration the existence of a going business on the land in question as indicative of the highest economic use to which the land may be put. *State ex rel. La Prade v. Carrow*, 57 *Ariz.* 429, 433, 114 *P.* 2d 891; *Philbrook v. Berlin-Shelburne Power Co.*, 75 *N. H.* 599, 74 *A.* 873; *Hunter's Administrator v. Chesapeake & O. Ry. Co.*, 107 *Va.* 158, 165, 59 *S. E.* 415, 17 *L. R. A., N. S.*, 124."

See *State Highway Com. v. National Fireproofing Corp.*, 127 *N. J. L.* 346, 348 (*E. & A.* 1941).

In the instant matter the condemnation commissioners will be governed by *R. S.* 20:1–9 which provides that they shall view and examine the property and "make a just and equitable appraisement of the value of the same." The property being taken under the terms of *R. S.* 40:60–25.1 is land which has been operated profitably by the appellants for many years as a parking lot. Its fair market value,

measured by the price which would voluntarily be agreed upon between the hypothetical owner willing to sell and the hypothetical buyer willing to buy, would be fixed after the due weighing of all the factors which customarily enter into their purchase and sale negotiations. A foremost factor in such sale of the parking lot would be its prospective earning power evidenced in considerable part by past earnings. Such sale of the parking lot would actually result in a transfer of the whole commercial enterprise involved—and, as a practical matter, the same result would flow from a forced transfer of the land to the city for public parking purposes. In the light of the foregoing there appears to be nothing in the judicial precedents which would preclude the commissioners from making an award which would truly constitute just and equitable compensation for the taking of the appellants' parking lot. In any event, no award has yet been made and after it is rendered the interested parties will have ample opportunity to have its *quantum* reviewed in accordance with the governing provisions of our statutes and rules.

The judgment of the Appellate Division is:

Affirmed.

VANDERBILT, C. J. (dissenting). No one can deny the need of Trenton and many other municipalities for off-street parking facilities, and therefore no one can question the grant of the power of condemnation to municipalities for this purpose. Even property presently used by private owners for furnishing parking facilities to the public may be so acquired by the municipality, if by doing so the public will be provided with greater parking facilities than the private owners are supplying and if the condemnation is made in good faith.

The question here is whether there has been compliance with these conditions. In its brief and at the oral argument and again at the reargument the city reiterated that it intended to build a multi-story ramp garage on the premises in question. When this was questioned by the defendants, counsel for the city agreed at the reargument that the city

would put its determination with respect thereto in binding legal form, and the decision of the case was delayed pending such action. In due course counsel for the city advised the court by letter that the city was unwilling to commit itself to the position counsel had taken in his brief and at the oral arguments. From this we can only draw one inference, *i. e.*, that the use to which the city would put the property after condemnation would result in no greater parking facilities for the public than it is now obtaining through private ownership. In these circumstances the so-called condemnation would not be a taking of property for a public purpose, which is a fundamental prerequisite of any condemnation, since no public purpose would be served by a taking where no increase in parking facilities would result therefrom. In these circumstances, without more, the condemnation proceedings would be fatally defective in law. When the facts are examined in the light of the city's new position taken after the reargument, it would seem that the proceedings constitute a misuse of the condemnation statute, for they will not obtain the result intended by the statute; and this makes imperative a plenary inquiry on the question of whether the proceedings are directed to the fulfillment of a public purpose within the powers of eminent domain. The courts have never permitted statutes to be used in such a way as to pervert their true objective by a mere colorable compliance with their requirements.

The Constitution forbids the condemnation of property for private use; and this is ultimately a judicial question after full inquiry. When land is thus taken, ostensibly for a public use, but in reality for a private use, the invasion of the individual's constitutional right of property is remedial by judicial action. An abuse of the statutory discretion and power is as objectionable here as in other fields of governmental action; compare *City of Cincinnati v. Vesler*, 281 *U. S.* 439, 50 *S. Ct.* 360, 74 *L. Ed.* 950 (1930). See 65 *A. L. R.* 504.

It is urged by the city that if it does not acquire the defendants' property now, there is always the danger that

the owners will sell it for a department store, or other multi-story building, and so decrease the amount of parking facilities available to the public. There is no substance to this argument, for if the property were so sold (and it is interesting to note that no present danger of this eventuality is shown) the city could quickly condemn the property before any new building could be erected.

The individual owners assert that the city is not acting in good faith in condemning their property, and the conduct of the city as outlined herein bears strongly upon that issue. There is, moreover, another factor which deepens the impression that the action of the city in condemning the property is not a *bona fide* exercise of the power. Directly opposite the parking lot in question is an equally sizable piece of property owned by the city itself. An ancient building known as the Joseph Wood School stands thereon. This building has not been used as a school for 30 years. At the present time only a few rooms are used for the storage of surplus books from the adjoining public library. This piece of property is obviously quite as desirable for parking purposes as the property of the defendants. Is there any reason why the city should not use this practically abandoned property for parking facilities and thus double, without constructing any new buildings, the parking facilities of this part of Trenton? That it has not done so, but has elected to take proceedings that will deprive the defendants of a valuable business without adding to the available parking facilities, constitutes evidence that entitles the defendants to a plenary trial on the issue of the city's good faith, a matter that cannot be disposed of, as was done here, on a motion for summary judgment, *Mayflower Industries v. Thor Corp.*, 15 *N. J. Super.* 139, 155–157 (*Ch. Div.* 1951), affirmed for the reasons expressed therein, 9 *N. J.* 605 (1952).

The necessity of such a trial to protect the defendant property owners is rendered more acute by the fact that under the statutes now on the books the city may without competitive bidding lease the property acquired by condemnation to a private individual or corporation to conduct as a

parking lot. Obviously such an individual or private corporation would enter into such an arrangement only with the hope of making a profit out of it. The possible danger to the public welfare and morals inherent in such an arrangement does not need to be diagramed. It is so apparent as to require in the particular circumstances of this case the clearest proof of the good faith of the city before it should be permitted to exercise the power of condemnation. From the standpoint of the individual owners of the parking lot it is as unjust as it is ironic to think that they must submit to having a valuable business taken away from them in the guise of serving the public interest without there being any increase in the parking facilities in the city, only to find that their business may be turned over by the city to another individual or private corporation to conduct at a profit.

I would reverse the judgment below and direct a plenary trial of the city's right to condemn the property.

Mr. Justice HEHER has authorized me to say that he joins in this opinion.

*For affirmance*—Justices OLIPHANT, WACHENFELD, BURLING and JACOBS—4.

*For reversal*—Chief Justice VANDERBILT and Justice HEHER—2.