35 N.J. Super. 479 (1955)
114 A.2d 461
COUNTY OF ESSEX, A PUBLIC CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
THEODORE M. HINDENLANG, THEODORE G. HINDENLANG, AND EMMA B. HINDENLANG, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 16, 1955.
Decided May 20, 1955.
*481 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Theodore G. Hindenlang, appellant, argued the cause pro se (Mr. Theodore M. Hindenlang, Mr. Theodore G. Hindenlang and Mrs. Emma B. Hindenlang, attorneys pro se).
Mr. Marshall Crowley argued the cause for respondent.
*482 The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendants challenge plaintiff's power to condemn their property for use as a parking lot for the Court House and the Hall of Records of Essex County. This legal issue is central to a determination of their appeal from the summary judgment entered against them on plaintiff's motion, pursuant to R.R. 4:58.
Plaintiff instituted condemnation proceedings under R.S. 40:32-2 and 3 to acquire defendants' property at 73 1/2 13th Avenue, Newark, N.J. By its complaint it demanded judgment against defendants and the appointment of three commissioners, in accordance with R.S. 20:1-1 et seq., as amended and supplemented, to fix the compensation to be paid for the taking of the property. Process in the form of an order to show cause issued. R.R. 4:92-3 and 4:85-3. Defendants appeared pro se. Their answers and affirmative defenses denied any authority in the county to condemn their property for a parking area under R.S. 40:32-2 and 3, alleged that its acquisition was, in fact and in law, not necessary, and that the condemnation would violate their constitutional rights inasmuch as the property was not being taken for a public use.
The affidavits filed in support of plaintiff's motion for summary judgment disclose that the county has since May 1953 maintained an off-street parking lot in the rear of the Hall of Records, bounded by Nelson Place on the north and Howard Street on the west. This lot has served as a parking space for county officers and employees, judges and jurors attending the courts in the Hall of Records and the adjacent Court House, and for other persons lawfully using the county facilities located in those buildings. It accommodates about 170 automobiles, but is not large enough to take the cars of all the persons just described. The parking area has not eliminated traffic congestion in the streets surrounding the two county buildings, particularly on Nelson Place and 13th Avenue.
The affidavits further show that the county has acquired 18 of the 19 properties located in the area immediately to *483 the rear of the Hall of Records, bounded by 13th Avenue on the south and Howard Street on the west, for the purpose of constructing and maintaining an additional parking space contiguous to the existing lot. The only property not acquired by the county is that involved in this action; those already acquired are located on both sides of defendants' premises. The additional parking space, when constructed, will accommodate about 150 automobiles. Together with the present lot it should provide suitable off-street parking for the Court House and Hall of Records, made necessary by the traffic congestion and parking conditions in the vicinity.
The county began negotiations to acquire defendants' property as early as March 1953. The premises were then owned by defendant Theodore M. Hindenlang. Negotiations continued until December 1954, and were attended by exchanges of correspondence, an appraisal and reappraisal of the property, and conferences with county representatives, three of them with the board of freeholders itself. The county offered $19,600; the sum finally demanded by the owners was $28,624.80. At their last appearance before the board on December 9, 1954, when the resolution shortly to be mentioned was adopted, defendants requested that the county withhold for two days the filing of its complaint. The board thereupon instructed county counsel not to file the complaint prior to December 13. During the intervening period, and on December 11, 1954, there was recorded a contract of sale between Theodore M. Hindenlang and his son Theodore G. Hindenlang, providing for the sale of the property to the latter for $28,000.
Plaintiff's affidavits show not only that the existing parking area is insufficient and that persons entitled to park there have regularly been turned away, but also that the plans of the freeholder board for the construction of the additional parking area have been delayed because of the inability of the county to come to an agreement with the owners as to price. The affidavits of County Engineer and Supervisor of Roads Colwell and of Newark Traffic Engineer Cyr substantiate the necessity for the construction of the planned parking area.
*484 Defendants submitted only one affidavit in opposition to the motion for summary judgment  that of Theodore G. Hindenlang. It contradicts none of the facts contained in plaintiff's affidavits. Instead, it argues that the primary purpose of the proposed parking lot is the parking of the automobiles of county officers and employees, and that they should be required to use available bus lines and the city subway. It suggests that a current engineering survey of Newark's parking needs should first be studied, and registers various complaints against the board of freeholders.
In granting plaintiff's motion for summary judgment the trial court held that "government in all its branches necessarily has implied power to condemn land for the purpose of erecting parking lots contiguous to public buildings for the purpose of being used by those employees and others who have constant access to those public buildings." Two reasons were assigned for this conclusion: (1) "government has the right to provide parking space for its own employees in a reasonable manner," and (2) "by having parking space reasonably available to public buildings it aids the overall congested traffic problem which presses upon us constantly in a metropolitan area such as is Newark." After finding that the moving papers  the resolution of the freeholder board and the affidavits filed in support of the motion for summary judgment  showed a reasonable necessity for the taking, and after pointing out that defendants had been aware of the expenditure of public funds for the acquisition and use of the adjoining lands for a parking area, the trial judge concluded that in his opinion "it is essential to carry on reasonably the function of government to provide reasonable parking facilities at reasonable locations to the public buildings to which people habitually and daily come." He found that there was palpably no genuine issue as to any material fact and that the right of the county to acquire land for the purposes set forth in the resolution of the board of freeholders is one of the powers expressly or impliedly granted by R.S. 40:32-2 and 3.
*485 The board of freeholders had initially taken formal action to acquire defendants' premises "for public purpose" by resolution dated June 24, 1954. A second and more complete resolution was adopted December 9, 1954, whereby the board determined that
"* * * it is necessary, useful and suitable to acquire [defendants' property] * * * for the public purpose of a parking area for the Court House and the Hall of Records of Essex County, the same being public buildings of the County of Essex for the accommodation of the courts required to be held in the County of Essex and for the transaction of the public business, the location of public offices and the use of the departments and officers of the County of Essex, * * *."
After reciting that the board had been unable to acquire the property by agreement, the resolution directed county counsel to institute condemnation proceedings.

I.
A county may acquire by condemnation any real estate within its limits "which it may deem necessary or useful for the proper exercise of any power expressly or impliedly conferred upon it." R.S. 40:32-2. One of the powers expressly conferred upon counties is the power to "acquire and maintain such buildings as may be necessary and suitable for the accommodation of the courts required to be held in the county, for the transaction of public business, the location of public offices, the use of the departments and officers of the county, * * * or any other public purpose." R.S. 40:32-3.
Defendants argue that the county has no inherent right of condemnation but must rely upon the grant of such right by the Legislature; that R.S. 40:32-2 and 3 must be strictly construed; and that so construed these statutes do not give the county either express or implied power to condemn their property for use as a parking lot.
Under the cited statutes, plaintiff has express authority to condemn land for a court house and for an administration *486 building like the Hall of Records. The acquisition and maintenance of a parking area for the use of county officers and employees, and for those connected with the courts or who come on county business, is a necessary and reasonable adjunct to the acquisition and maintenance of a court house and administration building. True, authority to condemn for such a parking area has not been conferred upon counties in express words, but the power is certainly one that can be implied from the specific grant contained in R.S. 40:32-2 and 3. The statutory language is broad enough to comprehend such an implied power.
The 1947 State Constitution lends support to this conclusion. Art. IV, § VII, par. 11 provides:
"The provisions * * * of any law * * * concerning counties, shall be liberally construed in their favor. The powers of counties * * * shall include not only those granted in express terms but also those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by this Constitution or by law."
The condemnation of lands for a parking area for public buildings is plainly a power that is "of necessary or fair implication, or incident to the powers expressly conferred [to purchase, erect or otherwise acquire and maintain public buildings  R.S. 40:32-3] or essential thereto." It is equally plain that such condemnation is not inconsistent with or prohibited by the Constitution or by law. The constitutional mandate that provisions of laws concerning counties shall be liberally construed in their favor is adhered to by our courts. Henninger v. Board of Chosen Freeholders of Bergen, 2 N.J. Super. 1 (App. Div. 1949), affirmed 3 N.J. 68 (1949), involving R.S. 40:32-3.
The need of adequate parking facilities in urban centers is one of the pressing problems of our motor age. The existence of the problem has been recognized by our courts. City of Trenton v. Lenzner, 16 N.J. 465 (1954), affirming 29 N.J. Super. 514 (App. Div. 1954), which in turn affirmed 22 N.J. Super. 415 (Law Div. 1952); DeLorenzo v. City of Hackensack, 9 N.J. 379 (1952); see also the cases cited in *487 8 A.L.R.2d 373 (1949). At a time when government is bending every effort to keep our main arteries of travel clear of the clogging effect of parked automobiles  note, for example, the growing number of municipal zoning ordinances which require business and commercial enterprises to establish off-street parking facilities  it cannot seriously be contended that government lacks the implied power, as an incident to its express power of constructing and maintaining public buildings for the conduct of the public business, to acquire and maintain off-street parking facilities for the use of its officers and employees, the courts, jurors and others having legitimate public business to transact in those buildings.
Defendants stress that R.S. 40:32-2 and 3 were enacted in 1918 (L. 1918, c. 185), when parking lots were only a dream in the mind of the automotive industry. They argue it could not have been the legislative intention to grant an implied power to do something which was not even in legislative contemplation at the time. But a grant of power is not to be construed in so limited a fashion. As was said in City of Trenton v. Lenzner, 16 N.J. 465, 470 (1954), "What constitutes a proper use will depend largely on the social needs of the times and may change from generation to generation." Plaintiff's view would lead to a static society. The implied powers of government must change as the demands of society change.

II.
It is next argued that the condemnation of defendants' property for use as a parking lot by county officers and employees, judges, jurors, court personnel and others attending the Court House or Hall of Records on court or county business, constitutes a taking of private property for a private use. Defendants claim that the use of the parking area by those persons would leave little if any space for the general public visiting the two buildings. In their view, it is neither necessary nor desirable for the county officers, employees and *488 the others to drive to work and park next to the county's administrative center; public transportation systems are reasonably close at hand, and if they must drive they can park at existing nearby parking areas. Convenience, say the defendants, does not create a public necessity justifying the condemnation.
Courts dealing with problems of eminent domain have generally been reluctant to define the phrase "public use." See, for example, Albright v. Sussex County Lake and Park Commission, 71 N.J.L. 303, 306 (E. & A. 1904). Like authorities in the field, they have recognized that the phrase "is incapable of a precise and comprehensive definition of universal application." 2 Nichols on Eminent Domain (3d ed. 1950), § 7.2, p. 429. To attempt to formulate an ultimate definition "would, in an inevitably changing world be unwise if not futile. * * * The law of each age is ultimately what that age thinks should be the law." New York City Housing Authority v. Muller, 270 N.Y. 333, 340, 1 N.E.2d 153, 105 A.L.R. 905 (Ct. App. 1936); Jahr on Eminent Domain (1953), § 6, pp. 15-16. In considering the question of public use, Cooley steered a careful course between what was most likely to subserve the general welfare for which the constitutional power of eminent domain is delegated, and the protection of private property rights, equally the concern of our Constitution (Art. I, par. 20):
"* * * The reason of the case and the settled practice of free governments must be our guides in determining what is or is not to be regarded a public use; and that only can be considered such where the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience, or welfare, which, on account of their peculiar character, and the difficulty  perhaps impossibility  of making provision for them otherwise, it is alike proper, useful, and needful for the government to provide." Cooley, Constitutional Limitations (8th ed. 1927), p. 1131.
Judicial attempts to describe the subjects to which the expression "public use" would apply have proceeded on two different theories. One theory of "public use" limits its *489 application to "use by the public"  public service or employment. Under this view, to make a use public the person, corporation or governmental unit or agency seeking to take property by condemnation would be under a duty to furnish the public with the use intended; the public would be entitled, as a matter of right, to use or enjoy the property taken. This view is the more narrow and conservative of the two possible approaches to the subject. There is substantial authority to support it, but the cases so holding have been criticized as often disclosing a tendency to treat the question of public use as one to be decided by the courts without regard to the assertion upon that point by the legislative body. Much of the support for the more limited view comes from the earlier cases.
Courts that take the broader and more liberal view in sustaining public rights at the expense of property rights hold that "public use" is synonymous with "public benefit," "public advantage," or "public utility." Jahr, op. cit., § 6, p. 16. Many of them consider the narrow concept as no longer the prevailing view. Krause v. Peoria Housing Authority, 370 Ill. 356, 19 N.E.2d 193 (Sup. Ct. 1939); Spahn v. Stewart, 268 Ky. 97, 103 S.W.2d 651 (Ct. App. 1937); Kansas City v. Liebi, 298 Mo. 569, 252 S.W. 404, 28 A.L.R. 295 (Sup. Ct. 1923); New York City Housing Authority v. Muller, above; Dornan v. Philadelphia Housing Authority, 331 Pa. 209, 200 A. 834 (Sup. Ct. 1938); McNulty v. Owens, 188 S.C. 377, 199 S.E. 425 (Sup. Ct. 1938).
Each of the definitions of public use is in some respects too broad and in others too narrow:
"* * * Neither is sufficiently comprehensive to justify the taking of land for all the purposes that the courts have held to be proper, while each of them leads logically to the employment of eminent domain for purposes at which the ordinary mind, both legal and lay, would instinctively revolt. For example, if `public use' means `use by the public,' eminent domain may be employed to secure sites for hotels and theatres, which are bound by custom or statute in many states to serve the public without discrimination. On the other hand, the weight of authority, which sustains the exercise of eminent domain for purposes sanctioned by ancient custom and in behalf of *490 improvements vital to a state's prosperity, must be disregarded. If, however, `public use' is synonymous with `public advantage,' or rather what the legislature might reasonably conceive to be the public advantage, eminent domain might constitutionally be employed in behalf of all large industrial enterprises, and the size of farm holdings might be regulated to suit the prevailing economic theory of the time. On the other hand, the devotion of even a highway to use by the public would not in itself be sufficient to justify the exercise of eminent domain unless it appeared that enough of the public were likely to use the road to make its establishment a public advantage." Nichols, op. cit., § 7.2[3], pp. 437-438.
This merely illustrates that any attempt at a concise and comprehensive definition of "public use" would be unsuccessful. Only by the gradual process of judicial exclusion and inclusion, and by a study of the influences which have affected the development of the law in the area under consideration, can any authoritative delimitation of "public use" be attained. Among these influences one of the most significant is the historical development of public use and the forces  economic, social and political  which have affected it. Local conditions and the specific constitutional provisions have been other controlling factors.
Authoritative analysis of the concept of public use has demonstrated that the public uses for which property may be condemned include the following: (1) to enable government to carry on its functions, and to preserve the safety, health and comfort of the public, whether or not its individual members may use the property so taken, provided the taking is by a public body; (2) to serve the public with some necessity or convenience of life required by the public as such and which cannot readily be furnished without the aid of the government, whether or not the taking is by a public body, provided the public may enjoy such service as of right; and (3) in special and peculiar cases, sanctioned by custom or justified by the existence of unusual local conditions, to enable individuals to cultivate their land or carry on business in a manner not otherwise possible, if their success will indirectly enhance the public welfare, even though the taking is by a private individual and the public has no right to the enjoyment of the property taken or to service from him. *491 Nichols, op. cit., § 7.22, pp. 444-445; cf. Cooley, op. cit., quoted above.
Use by the government, or use by or for the public as such, provides the justification for the taking of property by condemnation, and not use by or for particular individuals. The number of people who will participate in or benefit by the use for which the property is to be condemned is not the determinant of whether the use is or is not a public one. Under either the narrow or liberal definition of "public use" it is not necessary, for a use to be public, that the entire community or any considerable portion of it should enjoy the use. Albright v. Sussex County Lake and Park Commission, 71 N.J.L. 303, above, at page 304.
To return to the problem immediately before us, it is generally conceded that land may be taken by condemnation to enable government to carry on its functions. Without question, land can so be acquired for the site of a court house, a county administration building, or a similar structure in which governmental affairs are administered. The small number of cases touching the proposition are proof of its common recognition and acceptance.
"When property is taken for such a purpose there is no requirement in any state of `use by the public' in the sense that the individual members of the public should have the right to use the building erected on the land. The use is by the public through its officers and agents and there is no question that eminent domain may be employed in such a case although the public is permitted to use the property taken or have access to it only in a very restricted manner. * * *
* * * It is a virtual necessity to take by eminent domain the site of a large public building in the center part of a populous city. A reasonable interpretation of the constitution does not empower the courts to examine into the necessity of each case, * * *
* * * in the case of the exercise of eminent domain in order to acquire a site for public buildings the necessity of the taking is not material in any aspect." Nichols, op. cit., § 7.511, pp. 482-483.
See also 18 Am. Jur., Eminent Domain, § 49, p. 679. By the same process of reasoning, the intended use of the parking area is not rendered a private use because it will not be available to the public generally; the use is by the public *492 through its officers, employees and agents. Cf. City of Cleveland v. Ruple, 130 Ohio St. 465, 473-474, 200 N.E. 507, 511, 103 A.L.R. 853 (Sup. Ct. 1936).
Modern traffic conditions demand adequate parking facilities. The affidavits in this case show that traffic congestion and the lack of adequate parking facilities is a serious problem in the vicinity of the Court House and Hall of Records. The fact that the action taken by the county tends toward the solution of that problem, at least in good part, by providing a parking area for its officers and employees, court personnel, and those who attend the buildings on court or county business, does not derogate from its legality, established by appropriate tests. The more liberal view of what is a "public use" leads us to the conclusion that the proposed parking area is clearly for the public benefit, to the public advantage, and has public utility. The demands of modern society cannot be met by a return to the narrower concept that "public use" must be limited to "use by the public."
Defendants contend that plaintiff has failed to prove an essential element of its case, namely, that the taking of their property for a parking space is necessary. The determination made by the board of freeholders that it is "necessary, useful and suitable" to acquire the property for the purpose stated in its resolution of December 9, 1954, is conclusive in the absence of abuse of power or bad faith. The law of this State is settled that the determination that it is necessary, useful and suitable to acquire property by eminent domain is an administrative determination, discretionary in character, by the body endowed by the Legislature with the power to make it. Such determination will not be upset by the courts in the absence of an affirmative showing of fraud, bad faith or manifest abuse. City of Trenton v. Lenzner, 16 N.J. 465, 472-474 (1954); Burnett v. Abbott, 14 N.J. 291, 294-295 (1954); City of Newark v. New Jersey Turnpike Authority, 7 N.J. 377, 385-386 (1951). There is no such affirmative showing by defendants. On the contrary, plaintiff's affidavits show that the action of the board of freeholders was entirely in good faith and represented *493 a wise exercise of delegated power. They demonstrate the existence of parking conditions in the vicinity of and with relation to the county buildings which required attention in the public interest, and that the measures taken to meet these conditions were properly and reasonably necessary and useful to that end.
Defendants make the subsidiary argument that County Engineer Colwell and Newark Traffic Engineer Cyr, whose affidavits are mentioned in the early part of this opinion, were not qualified as experts and that defendants were given no opportunity to examine into their qualifications. Not only was the question not argued below  and therefore is not available to defendants on this appeal  but it is without merit. The inadequacy of existing parking facilities was not a matter which had to be established by expert testimony on motion for summary judgment; it was a condition which could be perceived and declared to exist by any intelligent observer.
The Law Division properly entered summary judgment for plaintiff. Under R.R. 4:58-3, a motion for summary judgment should be granted if the pleadings, depositions, and admissions on file, together with the affidavits, show palpably that there is no genuine issue as to any material fact challenged and that the moving party is entitled to judgment as a matter of law. City of Trenton v. Lenzner, 16 N.J. 465, 472 (1954); City of Newark v. New Jersey Turnpike Authority, 7 N.J. 377, 381 (1951); Mayflower Industries v. Thor Corp., 15 N.J. Super. 139 and 15 N.J. Super. 337 (Ch. Div. 1951), affirmed o.b. 9 N.J. 605 (1952); cf. Judson v. Peoples Bank and Trust Co., 17 N.J. 67 (1954). There was no genuine issue in this case as to any material fact challenged. The sole issue was one of law. Plaintiff was entitled to summary judgment as a matter of law.
Affirmed.