THE TOWN OF BLOOMFIELD, A MUNICIPAL CORPORA-
TION IN THE COUNTY OF ESSEX, APPELLANT, v.
NEW JERSEY HIGHWAY AUTHORITY, A BODY COR-
PORATE AND POLITIC OF THE STATE OF NEW JER-
SEY, RESPONDENT.

Argued February 28, 1955—Decided April 25, 1955.

*Mr. Thomas J. Markey* argued the cause for the appellant.

*Mr. Morris M. Schnitzer* argued the cause for the respondent.

The opinion of the court was delivered by

JACOBS, J.  On July 14, 1954 the Town of Bloomfield filed a complaint in the Chancery Division alleging that the New Jersey Highway Authority was about to construct service areas along the Garden State Parkway at points which had been zoned by the Town for residential purposes; it sought an injunction and a declaration that the Authority was subject to local zoning and building regulations in the erection of restaurants and gasoline stations at service areas along the Parkway within the territorial limits of the Town.  The Authority moved that the proceeding be transferred to the Appellate Division on the ground that the Town was seeking to review the final decision or action of a state administrative agency within the meaning of *R. R.* 4:88–8; on August 31, 1954 an order was signed transferring the cause.

In the Appellate Division the parties filed an agreed "statement of the facts and a definition of the issue upon this appeal."  This set forth that the plaintiff is a municipal corporation vested with the powers conferred by *R. S.* 40:1–1 *et seq.*; the defendant is a body corporate and politic created

by *R. S.* 27:12*B*–1 *et seq.*; the defendant is engaged in the construction of the Garden State Parkway which extends "for a distance of five miles, more or less, within the boundaries of the Town of Bloomfield, traversing various use and volume zones"; the chief engineer of the Authority approved the location of "parkway service areas, including restaurants, gasoline service stations, maintenance and police structures, upon a tract of land of approximately 22 acres, at a site in Bloomfield"; the Town of Bloomfield voiced its objections "and from time to time changes were made in the number and arrangement of" the structures to be constructed; the site approved by the chief engineer is in the small-volume residential zone as established by Bloomfield's zoning ordinance and is in the vicinity of one-family dwelling houses; and "the legal question to be resolved" is whether or not the defendant is authorized to develop the proposed service areas "over the objection of the plaintiff and in disregard of its Zoning Ordinance."

After the cause was transferred to the Appellate Division we certified on our own motion under *R. R.* 1:10–1. The parties have not raised the jurisdictional or procedural questions which bear on the transfer and certification and we shall not deal with them. With reference to the transfer, compare *Petrucelli v. Department of Civil Service of New Jersey*, 28 *N. J. Super.* 572 (*App. Div.* 1953) with *New Jersey Used Car Trade Ass'n v. Magee*, 1 *N. J. Super.* 371 (*Ch. Div.* 1948); *Abelson's, Inc. v. New Jersey State Board of Optometrists*, 3 *N. J. Super.* 332 (*Ch. Div.* 1949), modified 5 *N. J.* 412 (1950). With reference to the certification see *Const.* 1947, *Art.* VI, § 5, *par.* 1(*d*); *Const.* 1947, *Art.* VI, § 5, *par.* 3; *Brookchester, Inc., v. Ligham*, 17 *N. J.* 460, 462 (1955); *Stuyvesant Town, Inc., v. Ligham*, 17 *N. J.* 473, 474 (1955). Nor shall we deal with the suggestion that the Authority may have abused its discretionary powers in choosing the particular site selected rather than some other site along the Parkway. That issue is not before us either evidentially or under the pleadings and agreed statement. If the Authority is not bound by Bloomfield's zoning ordinance

then its choice of site rests within its discretion and will not be upset except upon "an affirmative showing of fraud, bad faith or manifest abuse." *City of Trenton v. Lenzner*, 16 *N. J.* 465, 473 (1954), *certiorari* denied 348 *U. S.* 972, 75 *S. Ct.* 534, 99 *L. Ed.* —— (1955); *Burnett v. Abbott*, 14 *N. J.* 291, 294 (1954); *City of Newark v. New Jersey Turnpike Authority*, 7 *N. J.* 377, 381 (1951). In the proceeding before us no such showing has been attempted and no fair opportunity for refutation has been afforded; we shall, therefore, confine ourselves to the single issue properly before us, *viz.*: is the Authority legally prohibited by the local zoning ordinance from constructing its proposed service areas along the Parkway in Bloomfield.

In his *First Annual Message* after the adoption of the Constitution of 1947, Governor Driscoll pointed out that our highway requirements were so acute and the current income of the State so limited that it was necessary to consider alternative methods for the financing and construction of needed "freeways, parkways and inter and intra-city and township highways." He later recommended that the Legislature authorize the creation of the New Jersey Turnpike Authority and such action was taken in *chapter* 454 of the *Laws of* 1948. The Authority was declared to be "an instrumentality exercising public and essential governmental functions" and was modeled upon similar bodies in other states. Indeed, the use of such independent agencies is nothing recent but was well known in early English and American history. See *De Lorenzo v. City of Hackensack*, 9 *N. J.* 379, 385 (1952); *Webb, Statutory Authorities for Special Purposes*, 17, 152 (1922). *Cf. Coons, The Development of Public Corporations in Economic Enterprise*, 206 *The Annals* 161 (1939). In his discussion of *Authorities And How to Use Them*, 8 *Tax Review* 47 (1947), Luther Gulick discusses the policy arguments *pro* and *con*; one of the familiar arguments *pro* is that the Authority "can reach across political boundaries, across city lines, county lines and even state lines, without raising the stubborn problems of annexation or fulminating the explosive passions of entrenched political organisms." In

any event, these policy arguments admittedly are for the Legislature and not for this court which found little difficulty in sustaining the basic constitutionality of the legislation. See *New Jersey Turnpike Authority v. Parsons*, 3 *N. J.* 235 (1949).

Pursuant to the enabling legislation of 1948 the Authority was organized and the 118-mile Turnpike was completed in due time thereafter. The success of its self-liquidating operations and the benefits which it has conferred upon our State and its people are now well recognized. In the course of its construction, it met with local resistance and on several occasions the contention was raised (though never pressed to litigation) that it was subject to local zoning or building ordinances. Apparently this occurred in connection with the construction of an administration building and a housing maintenance building in Central Jersey and a service area in North Jersey. Almost 30 years earlier a similar contention had been unsuccessfully advanced by the City of Jersey City in connection with the building of what is now the Holland Tunnel. See *New Jersey Interstate Bridge & Tunnel Comm. v. Jersey City*, 93 *N. J. Eq.* 550 (*Ch.* 1922). In holding that the Interstate Bridge and Tunnel Commission was not subject to the city's building code, Chancellor Walker expressed pertinent principles which are now well settled:

"Municipalities are the creatures of the state and the powers given to them are always subject to be abridged or repealed by the sovereign who conferred them. See *Eastern Telephone & Telegraph Co. v. Board of Public Utility Com'rs*, 85 *N. J. L.* 511. The building code of Jersey City was of course enacted subject to the power of the state to modify or annul it at any time. And the state, in the act creating the bridge and tunnel commission and clothing it with power to provide for interstate bridges or tunnels, with all the powers appropriate and necessary for the proper performance of such duties, without any limitation as to municipal control, overrode that code to the extent of nullifying its provisions so far as they required compliance with them by the state.

Statutes in derogation of sovereignty, such as those conferring powers on corporations, are to be strictly construed in favor of the state, and are not permitted to divest the state or its government of any of its prerogatives, rights or remedies, unless the intention of the Legislature to effect such object is clearly expressed in the

statute. 36 *Cyc.* 1177. No public right can be taken away by mere inference or legal construction. *Water Commissioners of Jersey City v. Mayor, etc., City of Hudson,* 13 *N. J. Eq.* 420. It will be noticed that there is no saving clause in the act creating the bridge and tunnel commission, whereby its powers are to be affected by municipal ordinances. As already seen, this tunnel project is an extension of the state highway system, and the control of highways by municipalities is always subject to paramount control by the state itself. *Water Commissioners of Jersey City v. Mayor, etc., City of Hudson, supra; Barnes v. Essex County Park Commission,* 86 *N. J. L.* 141."

See also *Port of New York Authority v. Weehawken Tp.,* 27 *N. J. Super.* 328, 333 (*Ch. Div.* 1953), reversed 14 *N. J.* 570 (1954), where Judge Drewen collected many decisions throughout the country which support the view that independent state and bi-state authorities are generally immune from "municipal ordinances and other local regulations."

In *Mayor, etc., Elizabeth v. New Jersey Turnpike Authority,* 7 *N. J. Super.* 540 (*Ch. Div.* 1950), the court readily rejected an attempt by Elizabeth to prevent construction of the Turnpike along the route through the city which had been designated by the Turnpike's officials within the statutory delegation, and in *City of Newark v. New Jersey Turnpike Authority,* 12 *N. J. Super.* 523 (*Ch. Div.* 1951), affirmed 7 *N. J.* 377 (1951), the court dealt in like fashion with a similar attempt by Newark. In the latter case Chief Justice Vanderbilt pointedly remarked (7 *N. J.,* at 387) that "the idea that any and every municipality along the route of the proposed turnpike could effectively veto either its location or the manner of its construction by a withholding of consent is in direct conflict with the very concept of a turnpike designed to serve the best interests of the entire state and not merely those of particular localities."

With the light of all the foregoing, Governor Driscoll, in his *Annual Message* to the Legislature dated January 8, 1952, recommended that an Authority be created to complete "the Garden State Parkway promptly as a revenue-financed facility." The Parkway had its origins in 1945 legislation (*L.* 1945, c. 83; *Abbott v. Beth Israel Cemetery Ass'n of Wood-*

*bridge,* 13 *N. J.* 528, 533 (1953)) but lack of funds 'had so limited its construction by the State that only 22 miles were completed in six years. In *L.* 1952, *c.* 16, the Legislature passed the act which created the New Jersey Highway Authority and empowered it, *inter alia,* to construct, maintain, repair and operate the project known as the Garden State Parkway. The Authority was constituted "an instrumentality exercising public and essential governmental functions" and the Legislature expressly declared that the exercise by the Authority of the powers conferred by the act "in the construction, operation and maintenance of projects shall be deemed and held to be an essential governmental function of the State." *L.* 1952, *c.* 16, *p.* 67. Projects were broadly defined to include the highway itself and all bridges, tunnels, overpasses, underpasses, interchanges, traffic circles, grade separations, entrance plazas, approaches, toll houses "service areas, service stations, service facilities," etc. *L.* 1952, *c.* 16, *p.* 66. The Authority was vested with the power of eminent domain (*L.* 1952, *c.* 16, *p.* 70) and was granted tax exemption in a provision which declared that the exercise of its powers "will be in all respects for the benefit of the people of the State, for the increase of their commerce and prosperity, and for the improvement of their health and living conditions." *L.* 1952, *c.* 16, *p.* 85. Finally, the Legislature directed that since the act was necessary "for the welfare of the State and its inhabitants," it should be liberally construed and all other inconsistent laws should be deemed inapplicable. *L.* 1952, *c.* 16, *p.* 94. *Cf. City of Newark v. New Jersey Turnpike Authority, supra,* 7 *N. J.,* at 387.

The constitutionality of the act creating the New Jersey Highway Authority was never questioned; however, in *Behnke v. New Jersey Highway Authority,* 13 *N. J.* 14 (1953), this court was called upon to determine the validity of *L.* 1952, *c.* 17, which authorized the State to guarantee payment of the Authority's bonds. We sustained that statute in an opinion by Justice Heher which pointed out that the operation of the Parkway was a "state project for public use" and that it did not matter "that for administrative reasons

deemed good and sufficient the fulfillment of the project was entrusted to an autonomous body created by the State." The opinion rightly stressed that the Authority was simply exercising "a public function on behalf of the sovereign" and was always "subject to control and dissolution by the sovereign which gave it being conditioned only upon observance of the constitutional guarantees against the impairment of the obligation of contract." See 13 *N. J.*, at 29. The guarantee of the Authority's bonds makes the profitable operation of the Parkway a matter of direct financial concern to the State; but there are many other aspects which are of vital importance to the State. In its *First Annual Report* the Authority appropriately noted that the Parkway was well designed to relieve disturbing traffic congestion, aid the State's economy, increase the recreational opportunities of its people, and contribute to the national "defense transportation network."

There is no doubt whatever as to the power of the Legislature to immunize its public Authorities from the provisions of local zoning and building restrictions. See *Jersey City v. Martin,* 126 *N. J. L.* 353, 361 (*E. & A.* 1941); *City of Newark v. New Jersey Turnpike Authority, supra.* In the latter case the court aptly said:

"The Legislature has broad and well established powers over municipalities, *Stothers v. Martini,* 6 *N. J.* 560 (*Sup. Ct.* 1951) and its ability to provide for the superiority of the Authority over the City in the respects here involved is therefore beyond question."

The only question remaining, therefore, is whether the Legislature contemplated by its enactment of *L.* 1952, *c.* 16, that the Authority would be subject, in the construction of its service areas, to local zoning and building requirements. Nowhere in the history or terms of the statute is there to be found any suggestion of legislative intent or purpose that the Parkway, as an important statewide facility, would be so restricted. Nevertheless, the Town contends (1) that the Authority is not the *alter ego* of the State (*New Jersey Turnpike Authority v. Washington Tp.,* 16 *N. J.* 38, 46 (1954)); (2) that its service areas constitute proprietary rather than

governmental functions (8 *McQuillin, Municipal Corporations* (3rd ed. 1950), 39); and (3) that consequently the Authority is not entitled to the immunity from local regulations which, it acknowledges, ordinarily extends to operations by the State itself and by its agencies engaged in governmental functions. *Cf. City of Charleston v. Southeastern Const. Co.*, 134 *W. Va.* 666, 64 *S. E.* 2d 676 (1951); *State ex rel. Helsel v. Board of County Com'rs*, 79 *N. E.* 2d 698 (*Ohio C. P.* 1947), appeal dismissed 149 *Ohio St.* 583, 79 *N. E.* 2d 911 (1948); *City of Milwaukee v. McGregor*, 140 *Wis.* 35, 121 *N. W.* 642 (1909); 1 *Yokley, Zoning Law and Practice* (1953), 69; *Rathkopf, The Law of Zoning and Planning* (2d ed. 1949), 108; *Note, Zoning Regulations as Applicable to Governmental Projects*, 171 *A. L. R.* 325 (1947).

We need not dwell upon the intimate relation between the State and the Parkway—we adhere fully to *Behnke v. New Jersey Highway Authority, supra,* where the Parkway was described as a state project for a public use which had, for administrative reasons, been entrusted to an autonomous body created by the State. Nor need we dwell upon the legislative description of the project as an essential governmental function. *Cf. New Jersey Turnpike Authority v. Parsons, supra; State ex rel. Allen v. Ferguson,* 155 *Ohio St.* 26, 97 *N. E.* 2d 660 (1951). See *Miller v. Port of New York Authority,* 18 *N. J. Misc.* 601, 603 (*Sup. Ct.* 1939). The operation of the 165-mile limited access highway itself, as a revenue-financed facility, is admittedly a proper governmental function and merely incidental thereto are the various subordinate operations (including the service areas) which are appropriate and necessary for the satisfactory fulfillment of the social objectives. In its brief, the Town concedes that "restaurants and filling stations" may well be necessary for the running of modern lengthy express highways and the fact seems to be that nowhere in the United States are such highways now being built or planned without them. *Cf. Public Authorities in the States* 86 (1953). It matters not whether these subordinate operations, considered alone, cross the shadowy line between governmental and proprietary functions

for, in either event, they constitute a proper public use. See *City of Trenton v. Lenzner, supra; Hill v. Borough of Collingswood,* 9 *N. J.* 369 (1952). In the *Lenzner* case, this Court upheld legislation permitting the condemnation of land which would be operated for public parking purposes by the City of Trenton, its Parking Authority, or its lawfully designated lessee. In the course of our opinion we said:

"The public use may be proprietary as well as strictly governmental in nature. *Cf. Yara Engineering Corp. v. [City of] Newark,* 132 *N. J. L.* 370, 373 (*Sup. Ct.* 1945) ; *Brady v. Atlantic City,* 53 *N. J. Eq.* 440, 448 (*Ch.* 1895) ; *Jahr, Eminent Domain* (1953), 14, 16. What constitutes a proper use will depend largely on the social needs of the times and may change from generation to generation. See *Ryan v. Housing Authority of [City of] Newark, supra* [125 *N. J. L.* 336] ; *Texas Pipe Line Co. v. Snelbaker,* 30 *N. J. Super.* 171, 176 (*Law Div.* 1954) ; *Jahr, supra. Cf. Albright v. Sussex County Lake & Park Comm.,* 71 *N. J. L.* 303, 304 (*E. & A.* 1904), where Justice Dixon found occasion to remark, shortly after the turn of the century, that the scope of eminent domain had 'been much enlarged in recent times to keep pace with the advance in social conditions.' In the light of modern conditions, it may no longer be doubted that the maintenance of public parking facilities designed to relieve traffic congestion constitutes a proper public use. See *De Lorenzo v. City of Hackensack,* 9 *N. J.* 379 (1952) ; *McSorley v. Fitzgerald,* 359 *Pa.* 264, 59 *A. 2d* 142 (1948) ; *Jahr, supra.*"

In the *Hill* case, the Camden County Park Commission leased a clubhouse and tennis courts on park land to an individual who was to operate an all-year milk bar and furnish tennis, boating and bicycling facilities. The clubhouse was located within an area which had been zoned by the Borough of Collingswood for residential purposes and the Borough sought to prevent its use for other purposes. This court (without any dissent) sustained the lease, declared the local zoning provisions inapplicable, and expressed principles and views which seem controlling in the Authority's favor on the legal issue presented in the instant matter. In the course of his opinion Justice Heher pointed out that the clubhouse and tennis courts were facilities for enjoyment of the dedicated public use and "in keeping with its character" and that their leasing was "in furtherance of, rather than a de-

viation from, the essential park use." He found the Borough's contention that the Commission was subject to the local zoning ordinance to be "untenable"; and after discussing the pertinent statutory provisions which vested broad powers in the Commission but contained no reference whatever to local zoning, he said:

"Thus, the Legislature has provided for the establishment of county park systems and governance under autonomous bodies in terms that clearly exclude the divisive control claimed by the municipality here. By explicit provision, the police power delegated to the municipality for use zoning and the regulation of merchandising may not be exerted within the area of special jurisdiction assigned to the park authority. The statutes are *in pari materia* and on well-settled principles of construction are to be given full force and effect, each in its own sphere of action. The theory of dual control advanced by the defendant municipality is at variance with the evident sense of the legislative expression. It is an unrealistic conception of the legislative scheme—such as would militate against the fulfillment of the basic statutory policy. This is the *ratio decidendi* of *Astley v. Board of Com'rs of City of Newark*, 98 *N. J. L.* 251 (*Sup. Ct.* 1922)."

See *Decatur Park Dist. v. Becker*, 368 *Ill.* 442, 14 *N. E.* 2d 490 (1938). *Cf. Carroll v. Board of Adjustment of City of Jersey City*, 15 *N. J. Super.* 363, 367 (*App. Div.* 1951).

In the recent case of *State ex rel. Ohio Turnpike Commission v. Allen*, 158 *Ohio St.* 168, 107 *N. E.* 2d 345, 350 (1952), *certiorari* denied *Balduff v. Ohio Turnpike Comm.*, 344 *U. S.* 865, 73 *S. Ct.* 107, 97 *L. Ed.* 671 (1952), the Supreme Court of Ohio rejected an attack against the legislation which authorized construction of the Ohio Turnpike. In the course of his opinion Chief Justice Weygandt summarily disposed of the contention that local zoning restrictions were applicable:

"A further complaint of the respondent is that the turnpike will pass through territory that has been zoned and that this will constitute a use in violation of the zoning ordinances. The answer to this is found in the first paragraph of the syllabus in the decision of this court in the case of *Doan v. Cleveland Short Line Ry Co.*, 92 *Ohio St.* 461, 112 *N. E.* 505, which reads as follows:
'Where an allotter adopts a plan for the improvement of his allotment whereby the use of the lots is restricted exclusively for residence purposes, such restriction cannot be construed as applying to

the state or any of its agencies vested with the right of eminent domain in the use of the lots for public purposes.'

This represents the majority rule and was approved and followed in the case of *Norfolk & Western Ry. Co. v. Gale,* 119 *Ohio St.* 110, 162 *N. E.* 385."

*Cf. Thornton v. Village of Ridgewood,* 17 *N. J.* 499, 513 (1955); *Tim v. City of Long Branch,* 135 *N. J. L.* 549 (*E. & A.* 1947).

The need for new highway construction has been expressly recognized by the Federal Government and the various states—the belief is widespread that the need is very urgent and that we cannot afford to wait. Along with New Jersey, our neighboring states are now in the midst of the building or extension of vital freeways and parkways but serious local resistance along the routes of construction is by no means uncommon. Illustrative is the recent instance in which the State of Connecticut was faced with objections by residents of Darien to the establishment of a service area in their town along the route of the New England Thru-Way; as expressed in the *New York Times* of March 13, 1955 (*p.* 61), they thought "the installations would be far better in Norwalk, which does not want them either." And more recently the *New York Times* carried a story (April 6, 1955, *p.* 31) of the widespread objections by local communities and residents to a proposed expressway from the George Washington Bridge to the Passaic River; one of the residents voiced the familiar attitude that he was not one "to stand in the way of progress" but he wanted to be assured that the road would not cross near his home. Such objections to the encroachments of new highways and their untoward incidents are, of course, understandable and are to be sympathetically heard and fairly considered by the agency charged with the high responsibility of effectuating the public objective with due regard for individual rights. But these rights, valuable as they are, must, in the public interest, give way to the greater good for the greater number and where the agency has, within its statutory delegation, conscientiously selected the route of the highway and the sites of its incidental facilities, it is highly proper

that the courts not intrude. *Cf. State ex rel. Helsel v. Board of County Com'rs, supra* [79 *N. E.* 2d 709]: "the law does not permit courts to select the location of sites for the establishment of essential public enterprises."

In the efficient and expeditious construction of the Garden State Parkway's traveled right of way, it was essential that it pass through residential areas of Bloomfield and other communities. It has not been suggested here or anywhere that in so doing the Authority was obliged to comply with local zoning restrictions and we find nothing whatever in the pertinent enactments to suggest that in this regard the Parkway's service facilities were to be differentiated from its traveled right of way. Indeed, the dominating policy considerations, as well as the legislative history and terminology, point diametrically in the other direction. They satisfy us that the Garden State Parkway legislation was intended to and does immunize fully the Authority's proper operations from the restrictive provisions of the local zoning ordinances of Bloomfield and the other communities along the Parkway's route.

The plaintiff's application for injunction and declaration are denied and its proceeding is:

Dismissed.

VANDERBILT, C. J. (dissenting). I disagree with the holding of the majority of the court that in the erection of gasoline stations and restaurants the New Jersey Highway Authority is not subject to the provisions of municipal zoning ordinances.

There is no question but that the Highway Authority had the power to condemn the land in question for the construction of a service area to be used in connection with the Parkway since the Legislature has the power to provide for the condemnation of property to be devoted to the public use, even where such use may be proprietary, *City of Trenton v. Lenzner*, 16 *N. J.* 465, 470 (1954).

It does not follow, however, that all property that has been validly condemned is exempt from municipal regulation.

Regardless of how desirable such services may be for the convenience of travellers upon the Parkway, the furnishing of gasoline, food and drink constitutes a proprietary function. In *Carroll v. Board of Adjustment of City of Jersey City,* 15 *N. J. Super.* 363, 367 (*App. Div.* 1951), the court held:

"The proposed use of the entire building is admittedly for office purposes. Such use is clearly a use for the purpose of business, and the use for 'business of any kind' is prohibited by the ordinance. We find no merit in the argument that the use for office purposes ceases to be a use for the purpose of business, merely because the use is made by a governmental agency."

In *O'Brien v. Town of Greenburgh,* 239 *App. Div.* 555, 268 *N. Y. S.* 173 (*App. Div.* 1933), affirmed without opinion 266 *N. Y.* 582, 195 *N. E.* 210 (*Ct. App.* 1935), the court enjoined a municipality from erecting a garbage disposal plant in a district where such a use was prohibited, holding that such a use was a corporate as distinguished from a governmental function:

"The general authority conferred on the defendants to establish disposal plants did not involve an express or an implied authority to establish them, or any of them, in violation of zoning ordinances adopted pursuant to the same source of power—the Legislature, and under which rights of individuals have become fixed." (268 *N. Y. S.,* at *page* 177)

To this same effect see *Taber v. City of Benton Harbor,* 280 *Mich.* 522, 274 *N. W.* 324 (*Sup. Ct.* 1937); 8 *McQuillin, Municipal Corporations, sec.* 25.15; Annotation 171 *A. L. R.* 325. It thus appears even where the business activity is to be carried on by a public body the courts recognize that it is not exempt from municipal regulation.

Here, however, the case is even stronger; the operation of the restaurants and gasoline stations in question will be carried on as a profit-making enterprise by private corporations or individuals who are to lease the property from the Authority. Clearly their operations are subject to general municipal regulation, such as sanitation and the police power generally, including zoning ordinances.

Nor can the legislative declaration that the operation and maintenance of such projects constitute the performance of "an essential governmental function" support the view of the majority. The Legislature cannot change the nature of an enterprise merely by labelling it as an essential governmental activity when patently it does not fall within that category, *Wendlandt v. Industrial Commission,* 256 *Wis.* 62, 39 *N. W. 2d* 854, 856–857 (*Sup. Ct.* 1949).

I would hold that in the erection of these service areas the Highway Authority is subject to local zoning ordinances.

*For dismissal*—Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—5.

*For reversal*—Chief Justice VANDERBILT and Justice WACHENFELD—2.