113 N.J. Super. 65 (1971)
272 A.2d 573
RUTGERS, THE STATE UNIVERSITY, PLAINTIFF,
v.
STEPHEN PILUSO, BUILDING INSPECTOR OF THE TOWNSHIP OF PISCATAWAY, THE BOARD OF ADJUSTMENT OF THE TOWNSHIP OF PISCATAWAY, AND THE TOWNSHIP COMMITTEE OF THE TOWNSHIP OF PISCATAWAY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided January 11, 1971.
*66 Mr. Clyde A. Szuch for plaintiff (Messrs. Pitney, Hardin & Kipp, attorneys).
Mr. Joseph Stevens for defendants Piluso and Piscataway Township (Messrs Roth & Stevens, attorneys)
Mr. Geza A. Stamberger, Jr., for defendant Board of Adjustment.
CONVERY, J.S.C.
This is an action in lieu of prerogative writs instituted by Rutgers, The State University (Rutgers), seeking a declaration that it is not subject to Piscataway Township's zoning ordinances. Pursuant to the provisions of the pretrial order, plaintiff moves for summary judgment on one of the counts of the complaint which seeks an adjudication of immunity. The Attorney General has been advised of this action and has previously received copies of the pretrial order and the memoranda on the motion for summary judgment.
The board of governors of Rutgers determined to erect 374 garden-type apartment units on property owned by Rutgers in Piscataway. The testimony before the board of adjustment revealed that these proposed units are one-bedroom and two-bedroom units and are to be used, depending on need and demand, for married students and their families or for single students. These proposed units are in Piscataway's ER-Education and Research zone.
In March 1964 Piscataway adopted a zoning ordinance which defined the uses specifically permitted in the Education and Research Zone, among others the following:
Dormitories for matriculated students; dormitories and other housing facilities for use by matriculated students and their families, provided, however, that such facilities do not exceed five hundred (500) units. [Art. XV, § 1, (B), 3(A) (iii)]
Rutgers already has approximately 500 apartments for use by matriculated students and their families in this zone.
*67 Rutgers sought building and zoning permits for the project but they were refused and Rutgers was advised that it would need a variance. An application for a variance was filed and hearings held. On July 29, 1969 the board of adjustment made its findings of facts, ultimate findings and conclusions, and denied the requested variance.
This action was then instituted by Rutgers. As the action progressed, this court ordered a remand for the purpose of creating a record. The board again on September 9, 1970 denied the requested variance.
During the course of the presentation of testimony on behalf of Rutgers, the overwhelming need for the housing facilities in question was made. The New Brunswick campus includes Douglass College, the College of Agriculture, the Engineering College, Rutgers College, the Graduate School, Livingston College and the Medical School. It was testified that the present enrollment of Rutgers at the New Brunswick campus was 9,905 students, full and part-time. By 1980 the enrollment in New Brunswick alone would be 19,432 students, excluding the evening division. The present number of full-time graduate students was 1,788, and approximately half of them were married. The projection was that in 1980 there would be approximately 5,900 graduate students, half of them married.
The University presently has approximately 200 new apartments and approximately 350 units dating from World War II to house married graduate students. To handle the need for married students in the period 1970 to 1980, it was testified that a minimum of 1,500 apartments would be required and that the need probably could go as high as 2,000 apartments.
It was testified that during the delay since the University originally applied to Piscataway, costs have increased approximately $2,000 per apartment.
The urgency of the housing needs was also demonstrated by testimony that the demand was sufficient to fill all the units immediately upon completion. Further, the demand for *68 apartments beyond the University's facilities would exist for at least the next ten years. It was stipulated that the project in issue is one for the promotion of higher education, namely, the furnishing of housing.
To understand the present problem as to whether Rutgers is subject to the zoning ordinance of Piscataway Township, a review of the history of Rutgers and the events leading up to the adoption of the Rutgers, The State University Law, L. 1956, c. 61, N.J.S.A. 18A:65-1 et seq., is necessary. Such a history, up to 1956, is fully incorporated in the opinion of Judge (now Justice) Schettino in Trustees of Rutgers College in N.J. v. Richman, 41 N.J. Super. 259 (Ch. Div. 1956), and need not be repeated here. Shortly after that opinion was rendered the Rutgers trustees voted to reorganize under the above act.
A major structural change in the relationship between Rutgers and the State occurred in 1956 (the 1956 Act), L. 1956, c. 61. Under that act Rutgers assumed what is substantially its present posture and was renamed as "Rutgers, The State University." N.J.S.A. 18:22-15.2 (1956); N.J.S.A. 18A:65-2 (1968).
All property and educational facilities of Rutgers, including "all departments, colleges, schools, centers, branches, educational and other units and extensions," continued "to be impressed with a public trust for higher education of the people of the State of New Jersey." N.J.S.A. 18:22-15.27 (1956), now incorporated into N.J.S.A. 18A:65-2, 3 (1968). The same section again characterized the University as "the instrumentality of the State for the purpose of operating the State University."
Under the 1956 act control of the University is divided between a board of trustees and a newly created board of governors. Six of the 11 members of the board of governors are to be appointed by the Governor with the advice and consent of the Senate, and the remaining five by the board of trustees from among its members. N.J.S.A. 18A:65-14 (1968).
*69 Essentially, the board of trustees retains overall advisory capacity and responsibility for supervision and control of the properties, funds and other trust assets vested in Rutgers as of August 31, 1956. N.J.S.A. 18A:65-26 (1968). Thus, the board of trustees performs the classic functions of fiduciaries in preserving the trust property and making available to the board of governors the income for use by the University. The board of governors, by contrast, is vested with general supervisory power over the conduct of the University and over property vested in the University subsequent to August 31, 1956. N.J.S.A. 18A:65-25 (1968).
Is Rutgers as the Instrumentality of the State of New Jersey for the Purpose of Operating the State University Subject to Zoning Ordinances Enacted by Municipal Corporations?
Under the 1956 act Rutgers has the responsibility to further the purposes of higher education in the State. N.J.S.A. 18A:65-2 (1968) provides in part:
[T]he property and education facilities, rights and privileges of [Rutgers] are and shall continue to be impressed with a public trust for higher education of the people of the state of New Jersey; and [Rutgers] is the instrumentality of the state for the purpose of operating the state university.
Trustees of Rutgers College in N.J. v. Richman, supra., referred to the trustees' proposed acceptance of the 1956 legislative program as "their decision to become an arm of the State." (At page 284). Thereafter, the court said:
The corporation is to continue as an instrumentality of the State for the purpose of maintaining the State University, with its property and educational facilities impressed with a public trust for higher education for the people of the State. Similar provisions designating Rutgers as an instrumentality of the state for providing public higher education, and impressing the property of the Trustees of Rutgers College in New Jersey with a public trust for higher education, were set out in L. 1945 c. 49, but without placing control in a Board of Governors, a majority of whose members are public appointees. [at 296, emphasis added]
*70 Justice Schettino noted that Rutgers had been treated as a public instrumentality under the State Employees Retirement System and that the question whether University employees qualified for privileges under the Federal Social Security Act, that act providing for the extension of coverage to "services performed by individuals as employees of * * * any political subdivision," was resolved in favor of the employees. The definition of "political subdivision" within the federal statute includes "instrumentality of the State." Id. at 297.
Justice Schettino further referred to Rutgers as the "alter ego" of the State, to which donations of land and appropriations of money might be made without offending constitutional prohibitions. Id. at 298. He specifically stated:
Thus, even were it held (and I do not so find) that "Rutgers, The State University" is a private institution, that institution, acting through its Board of Governors, would be under a substantial and definite obligation to the State for the fulfillment of public purpose. [at 300]
He further said:
Thus we find here created a hybrid institution  at one and the same time private and public, with the State being granted a major voice in management, and the designation "State University"; and the institution being granted private autonomy and control of physical properties and assets. [at 289-290]
It is my conclusion from the statute and Justice Schettino's conclusions that Rutgers is an instrumentality of the State, and as such instrumentality is immune from local zoning ordinances. Bloomfield v. N.J. Highway Authority, 18 N.J. 237 (1955).
In Bloomfield the Supreme Court concluded that an instrumentality of the State, such as the Highway Authority, should be immune from local zoning ordinances if the following criteria are met:
1. The project is a State project for a public use;
2. The public purpose is an essential governmental function;

*71 3. The public need for such a project is urgent;
4. The public goal could be completely thwarted by the intervention of local communities and
5. The history or statute is devoid of any indication of legislative intent or purpose that such an important State wide facility should be so restricted.
Applying these criteria to the instant case, one finds that Rutgers, by statutory mandate, is an instrumentality of the State entrusted with a vital State function  operating the State University. The education of youth is a fundamental public policy and is an essential governmental function. The promotion of public higher education is the logical extension of this basic policy. The Legislature declared in N.J.S.A. 18A:65-9 (1968) that the establishment of the University as a State University was necessary "for the welfare of the state and the people of New Jersey to provide for the development of public higher education and thereby to increase the efficiency of the public school system of the state * * *"
The public need for the development of educational institutions is urgent. If New Jersey educational facilities fail to increase their collective educational capacity significantly, students will face severe difficulty matriculating within the State as will those seeking college admission outside the State.
It is obvious that the legislative goal would be thwarted were not immunity intended in the legislative scheme. Rutgers maintains three major campuses, located in seven different municipalities. The New Brunswick campus itself is in five municipalities. The absence of immunity would result in local municipalities controlling virtually every decision concerning physical development of the University. That result would be contrary to the expressed intent to establish Rutgers as the State's instrumentality to operate the State University.
In Aviation Services v. Board of Adjustment, Hanover Tp., 20 N.J. 275 (1956), the court stated:
*72 If the purposes sought to be achieved are to be thwarted by zoning plans which arbitrarily exclude airport uses from an entire municipal domain the progress envisioned by the Legislature and stimulated by this statute may go unrecognized. Rules of statutory construction command a contrary result [at 283, emphasis added]
That principle was restated in Newark v. N.J. Turnpike Authority, 7 N.J. 377 (1951):
* * * [T]he idea that any and every municipality along the route of the proposed turnpike could effectively veto either its location or the manner of its construction by a withholding of consent is in direct conflict with the very concept of a turnpike designed to serve the best interests of the entire State and not merely those of particular localities. [at 387]
So, too, in the instant case municipalities represent a singular, local interest, whereas the University is responsible for the general interest of the people of the State. The University has been granted autonomy and authority to carry out its stated goals, and the interests of a local municipality should not be allowed to interfere.
Nowhere in the statute has the Legislature, expressly or by implication, indicated any intention to restrict Rutgers by subjecting it to municipal control. As the Supreme Court stated in Aviation Services, supra:
* * * [W]here the immunity from local zoning regulation is claimed by any agency or authority which occupies a superior position in the governmental hierarchy, the presumption is that such immunity was intended in the absence of express statutory language to the contrary. [20 N.J. at 282]
The presumption of immunity arises because there is no express language to the contrary. In the absence of such express contrary statement, "no public right can be taken away by mere inference or legal construction." N.J. Interstate Bridge & Tunnel Comm'n v. Jersey City, 93 N.J. Eq. 550, 553 (Ch. 1922).
Supporting the presumption of immunity are the provisions of the 1956 act. That act indicates that Rutgers, like other instrumentalities of the State, was created so that *73 local partisan considerations would not hamper its efforts to achieve its stated goals. A clear and unique public policy exists with respect to the University. As stated in N.J.S.A. 18A:65-27,
I. It is hereby declared to be the public policy of the state of New Jersey that;
a. the corporation and the university shall be and continue to be given a high degree of self-government and that the government and conduct of the corporation and the university shall be free of partisanship; and
b. resources be and continue to be provided and funds be and continued to be appropriated by the state adequate for the conduct of a state university with high educational standards and to meet the cost of increasing enrollment and the need for proper facilities. [Emphasis added]
Such a statement of policy must be liberally construed. A high degree of self-government is guaranteed and the independence of the University firmly established. The language evinces the intention to isolate the functioning of the University from partisan politics. By implication, such a policy requires the conclusion that Rutgers is immune from local zoning ordinances, and its choice of site rests within its discretion and will not be upset except upon "an affirmative showing of fraud, bad faith or manifest abuse." Bloomfield v. N.J. Highway Authority, supra, 18 N.J. at 240.
If the intent had been to subject Rutgers to local zoning ordinances, the Legislature would have done so expressly. As stated in Garden State Parkway Employees Union, Local 196, AFTE, AFL-CIO v. N.J. Highway Auth., 105 N.J. Super. 168, 171 (App. Div. 1969), "It is to be noted that whenever the Legislature intended to include authorities within the ambit of certain legislation, it expressly so provided."
For the foregoing reasons, plaintiff's motion for summary judgment based on its claim of immunity from municipal zoning ordinances as an instrumentality of the State of New Jersey is granted.