SMALL, J.T.C.
The plaintiff, Bergen County, in three separate appeals challenges the 1989 and 1990 added assessments made by the defendants boroughs of Franklin Lakes and Leonia on portions of County-owned parks leased to two private profit-making riding academies in the two boroughs. The only issue before the court is whether these parcels of land are exempt from or subject to local property tax. N.J.S.A 54:4-1. Valuation is not an issue.
Bergen County’s claim for exemption is made on two separate statutory grounds:
1. N.J.S.A 40:37-101, which exempts from taxation land and improvements owned by a county park commission, and
2. N.J.S.A 54:4-3.3, which exempts from taxation property owned by counties.
The two municipalities contend that even if initially exempt under either of the two cited statutes, the application of N.J.S.A 54:4-1.10 and N.J.S.A 54:4-2.3, which subject otherwise exempt property to taxation if leased to non-exempt entities, results in the taxability of the subject properties.
For the reasons expressed below, I have determined that the subject parcels are exempt from taxation and the assessments against them must be canceled.
Were the stables operated by the County for a public purpose there would be no question as to their tax exemption. Whether *131 exemption is lost by leasing the property to a profit-making entity turns on the precise use to which the properties are put. Thus, I begin with a discussion of the facts in this case pertaining to the use of the subject properties.
I.
Plaintiff in each ease, Bergen County, asserts that the riding facilities at each of the two locations run by concessionaires serves a public purpose. The defendants Leonia and Franklin Lakes boroughs assert that access to and actual use of the facilities were limited to a small number of mostly wealthy individuals and that the exclusive nature and limited utilization of the facilities, coupled with a limited attempt to encourage others to use them, indicate that the two riding facilities served a private rather than public purpose.
A. Leonia
Bergen County owns and operates Overpeck County Park, located within three municipalities — Leonia, Teaneek and Ridge-field Park. The park is comprised of approximately 804 acres. Located within that area in Leonia is a facility known as the Overpeck Riding Center, occupying approximately 40 acres, which was constructed by Bergen County in 1973.
The Riding Center is located on a central portion of the park which contains a wide variety of other park and recreational facilities such as a picnic facility, playground and wildlife refuge located immediately adjacent to the riding center. That portion of the park also contains an eighteen hole golf course, fitness field, jogging path, tennis courts, horseshoe courts, ball fields, bicycle and pedestrian paths and additional picnic facilities. The park serves a regional recreation need as well as some local recreation needs.
The Borough of Leonia deeded to Bergen County the land upon which the Overpeek Riding Center is located on September 26, 1951. Paragraph 9 of.the deed provides that Bergen County must continuously maintain the deeded property for park purposes.
*132 The Overpeck Riding Center consists of two main structures, one structure housing a hay barn and storage building, and another containing two indoor areas, the stable area where horses are kept, and the offices and manager’s apartment. Outdoors are two main riding arenas with several paddocks for the turnout of horses. There are presently fifty-seven horse stalls within the facility. The Overpeck Riding Center had been operated by Bergen County through its now-abolished Parks Commission from 1973 through June, 1983.
In November 1985, the Bergen County Grand Jury conducted an inquiry into the operation and management of the Overpeck Riding Center by the Bergen County Parks Commission between 1978 and June 1983. The operation was generally criticized for catering to a select group of individuals and not to the general public. In response to the criticism of the Bergen County Grand Jury, the County hired two experts to review and make recommendations regarding its operation. Subsequently, a decision was made to award a concession contract for the center.
Following the 1986 elections, the government of Bergen County was reorganized. All functions of the independent Bergen County Parks Commission were taken over by the County government directly, and the Parks Commission was abolished.
Following receipt and evaluation of bids, a concession contract was awarded to the high bidder, Claremont Riding Academy, Inc., on December 16,1987. That contract required the concessionaire to pay the County an annual fee of $86,022. In addition, the concessionaire was contractually obligated to provide the same services as the County provided when the facility was operated by the Parks Commission, namely, maintenance of the physical plant, providing all of the horses and equipment to operate the facility, as well as garbage removal, snow plowing and landscaping, twenty-four hour maintenance of the fire and burglar alarm systems, an on-site stable manager, and the boarding, worming, medical care, feeding and cleaning of Bergen County Police horses. The concessionaire was not required to provide trail riding under the concession contract due to liability insurance coverage problems *133 and because of the County’s concern for the safety and security of the trails. Pony rides could be provided at the option of the concessionaire; however, they were not required by the County due to the availability of pony rides at Van Saun County Park, located nearby in Paramus.
B. Franklin Lakes
Bergen County also owns and operates the Campgaw Mountain Reservation, located in Mahwah, Franklin Lakes and part of Oakland. This park consists of approximately 1,500 acres. Located within that park is the Saddle Ridge Riding Facility, occupying about thirty acres, approximately one half of which are located in Franklin Lakes. The facility had originally been a Nike missile base, constructed by the United States government in the 1950’s or 1960’s and acquired by the County and converted to a riding facility in the early 1970’s.
The Saddle Ridge Riding Facility is located in the southern portion of the Reservation which, in addition to the riding facility, contains an eighteen hole golf course, a driving range, lakes for swimming and fishing, a picnic grove, tennis courts, snack bar, hiking trails, campsites, archery range and Campgaw Ski Center.
The Saddle Ridge riding facility consists of three buildings, a riding trail, two riding rings and a lunge ring. There are no indoor riding facilities. There are approximately forty horse stalls within the facility.
On May 9, 1986, a concession contract to operate the Saddle Ridge riding facility was publicly bid and awarded to Open View Farms, Inc. That contract required the concessionaire to pay the County an annual fee of $8,700. In addition, the concessionaire was responsible for providing school and trail horses for public use, boarding, twenty-four hour security for the facility by means of an on-site manager, maintenance and repairs to the facility, and all horses and equipment to operate the facility. Due to problems with insurance coverage at the time, the concession contract only required that trail riding be provided for boarders. Pony rides were not required.
*134 This changed in 1987 when insurance coverage became available. Group trail riding is now provided at the facility. In addition, persons owning horses are permitted, by County policy, to ride throughout the County park, including the riding facility and trails.
The lease required that a minimum of 15 horses be available for public use at all times and that a maximum of 25 stalls be available for private rental.
C.
Despite the criticism made by the 1985 Bergen County Grand Jury, the testimony of the Bergen County officials in this case indicates that they did not closely supervise the operation of the riding facilities by the concessionaires. Thus, they appeared to lack knowledge as to the actual operation of those facilities. Testimony of those who were more familiar with the operation of the two facilities indicates that the predominant use of the facilities and the source of the greatest revenue was from horse owners who boarded their horses at the facilities and took lessons from the concessionaires, and from private and group lessons given to non-boarding customers. It appears that only a limited number of customers were permitted to hire a horse without taking a lesson.
I have concluded that at the Overpeck facility, approximately one half of the annual revenues were derived from boarders (who paid for board and lessons), and approximately one half of the revenues were derived from rentals and lessons to non-boarders. The testimony of Mr. Novograd, the concessionaire at the Over-peck Center, indicated that the rates charged for boarding and lessons were comparable to those at other riding facilities. Thus, although their rates may appear high to someone unfamiliar with the costs of maintaining a horse, I conclude that the rates charged by the concessionaires were market rates — they neither overcharged (which would lead to a windfall profit to the concessionaire) nor undercharged (which would lead to a subsidy to wealthy riders and horse owners).
*135 Based on the evidence, I have concluded that neither Bergen County nor its concessionaire at either facility made a significant effort to attract a large number of County residents to the parks. For the most part, each facility was used by a small number of Bergen County residents. Most of the revenue of each facility was derived from individuals who owned horses and stabled them at the facility.
The municipalities make much of the fact that current operation of the two riding facilities has not corrected many of the criticisms leveled at the County by the grand jury investigation regarding the operation of these facilities in 1985. Although these allegations may be correct in part, I am not convinced that the inefficient operation by the concessionaire, or the failure of the concessionaire to adhere to all of the terms of its contract with the County, should result in the loss of the County’s tax exemption. The conduct at the facility controls this court’s conclusion as to whether the operation of the facilities met the statutory standard for tax exemption. Clearly, the County or the former County Parks Commission could operate riding facilities which would not be subject to local property tax. Here, the County has contracted with a private concessionaire to operate the riding facility. The question which must be addressed is whether that contracting out results in a loss of the tax exemption.
Despite the fact that the two riding facilities were not used by a broad segment of Bergen County residents, I conclude that their operation as part of a large public recreation program and plan, in which the operation of horseback riding facilities constitutes only a small part, constitutes a public use. Although each individual facility might not be used by a large number of people, each facility constitutes a small part of an overall recreation scheme.
Additionally, the Appellate Division has held (in a context other than that of taxation) that a privately operated marina which is “targeted for the more affluent segment of our society’s recreation users” can still serve a public purpose by permitting the use and enjoyment of the balance of a park by all economic classes. Jersey City v. State of New Jersey Dept. of Environmental *136 Protection, 227 N.J.Super. 5, 22, 545 A.2d 774 (App.Div.) certif. denied 111 N.J. 640, 546 A.2d 551 (1988).
II

Applicability of N.J.S.A 40:37-101 or N.J.S.A 54:4-3.3

N.J.S.A 40:37-101 provides a broad exemption for lands acquired and maintained by county park commissions as follows:
The commission may acquire, maintain and make available to the inhabitants of the county wherein it is appointed, and to the public, parks and open spaces for public resort and recreation; may locate such public parks and places within the limits of the county; and for these purposes may take in fee or otherwise, by purchase, gift, devise or eminent domain, lands or any right or interest therein for public parks and open spaces within the county. Deeds of conveyance therefor shall be made to the commission by its corporate name, and it shall preserve, care for, lay out and improve any such parks and places, and make rules for the use and government of the same. The real estate so taken, and all buildings and improvements which may be placed thereon shall be exempt from all taxes, assessments and municipal liens.
[emphasis added.]
N.J.S.A. 54:4-3.3 provides a narrower exemption for county owned land as follows:
Except as otherwise provided by article 1 of this chapter (§ 54:4-1 et seq.), the property of the State of New Jersey; and the property of the respective counties, school districts and taxing districts used for public purposes ... shall be exempt from taxation under this chapter____
[emphasis added.]
Under the quoted Section county-owned property must be used for a public purpose in order to be exempt.
It is clear that N.J.S A 40:37-101 and N.J.S.A 54:4r-3.3 are mutually exclusive — that is, only one of these statutes will apply in any given situation. By the express terms of the tax statutes of this State, it is impossible to conclude that both exemptions apply. The logic runs as follows:
Under N.J.S.A. 54:4-1,
All property real and personal within the jurisdiction of this State not expressly exempted from taxation or expressly excluded from the operation of this chapter shall be subject to taxation annually under this chapter.
[emphasis added.]
*137 Under N.J.S.A 54:4-3.3,
Except as otherwise provided by article I of this chapter (§ 54:4-1 et seq.), the property of ... the counties ... shall be exempt from taxation under this chapter,
[emphasis added.]
Thus, if N.J.S.A 40:87-101 expressly exempts county park lands from taxation, then by the specific language of N.J.SA 54:4-1 and N.J.SA 54:4-3.3, the exemption provided under N.J.SA 54:4-3.3 does not apply. Similarly, only if N.J.SA 40:37-101 does not apply will N.J.SA 54:4-3.3 apply.
It is well settled “where two statutes on the same subject matter are in conflict, the statute which deals specifically with the subject shall prevail over the more general statute.” Springfield Tp. v. Union County Park Commission, 163 N.J.Super. 332, 342, 394 A.2d 907 (Law Div.1978) (citations omitted). In Springfield Tp., supra, the court held that when property is exempt under N.J.S.A 40:37-101, the general taxation provisions of Title 54 dealing with the date of the applicability of an exemption would not apply. 163 N.J.Super. at 343, 394 A.2d 907.
Clearly, if N.J.S.A 40:37-101 does not apply, then I must restrict my analysis to the exemption under N.J.SA 54:4-3.3. If, on the other hand, N.J.SA 40:37-101 does apply, then an analysis under N.J.SA 54:4-3.3 is superfluous. Thus, a critical question in my legal analysis is whether the County Parks Commission tax exemption provision in Title 40 extends to a county park owned directly by the County and not by the County Parks Commission.
On its face, it would appear that since the lands and improvements in question are no longer owned by the County Park Commission but directly by Bergen County, the Title 40 exemption would no longer apply. See generally, General Trading Co., Inc. v. Taxation Div. Director, 83 N.J. 122, 136-138, 416 A.2d 37 (1980) (“It is not what might have happened nor what the taxpayer could have done but what actually occurred that determines tax consequences.”).
The County argues to the contrary that the exemption contained in N.J.SA 40:37-101 does apply to the county-owned park land because of the express terms of the Optional County Charter Law, the statute under which Bergen County took direct control *138 of the subject park lands from the Bergen County Parks Commission. L. 1972, c. 154, N.J.S.A. 40:41A-1 to 144.
The Optional County Charter Law provides for a county executive form of government and encourages flexibility in the organization of county government. The purposes and intentions of that statute are made explicit in N.J.S.A 40:41A-30, which provides that:
The grant of powers under this act is intended to be as broad as is consistent with the Constitution of New Jersey and with general law relating to local government. The grant of powers shall be construed as liberally as possible in regal'd to the county’s right to reorganize its own form of government, to reorganize its structure and to alter or abolish its agencies, subject to the general mandate of performing services, whether they be performed by the agency previously established or by a new agency or another department of county government. All county offices, boards, commissions and authorities authorized or established by statute, ... shall be considered to be county agencies for the purposes of this section,
[emphasis added.]
The Optional County Charter Law is further explained in N.J.S.A 40:41A-26, which provides that:
For the purposes of this act, a “general law” shall be deemed to be such law or part thereof, heretofore or hereafter enacted, that:
a. Is not inconsistent with this act; and
b. Is by its terms applicable to or available to all counties, or;
c. Is applicable to all counties or to any category or class of counties, and deals with one or more of the following subjects: the administration of the judicial system, education, elections, health, county public authorities, taxation, and finance, and welfare.
Nothing in this act shall be construed to prevent counties from abolishing or consolidating agencies the existence of which has heretofore been mandated by State statute providing that such abolition or consolidation shall not alter the obligation of the county to continue providing the services previously provided by such abolished or consolidated agency.

The intent of this act is to enable a county that has adopted a charter pursuant to this act to cause any duty that has been mandated to it by the Legislature to be performed in the most efficient and expeditious manner, and, absent a clear legislative declaration to the contrary, without regard to organizational, structural or personnel provisions contained in the legislation mandating such duty.

[emphasis added.]
Read together, these statements of legislative intent and purpose can lead only to the conclusion that adoption of the Optional County Charter Law’s county executive form of government, and the reorganization of the government consistent' with *139 that adoption, should provide for the most efficient form of organization with no cost of reorganization. Thus, if a park owned by a county park commission were exempt from taxation under a statute broader in scope than the tax exemption statute generally applicable to county-owned land, the transfer of the park from the park commission to the direct administration of the county should not result in increased costs (i.e. a more restrictive tax exemption).
The tax exemption provided by N.J.S.A 54:4-3.3 is more restrictive than that provided by N.J.S.A 40:37-101 because the former, more general tax exemption statute requires that in order for county land to be exempt it must be used for public purposes, whereas the latter, more specific tax exemption for county parks merely requires that the parks be made available to the public.
In construing the effects of the enactment of the Optional County Charter Law on the Park Act, one court has stated:
In order to harmoniously construe the Optional County Charter Law and the Parle Act, provision was made in the former (N.J.S.A. 40:41A-26 and 40:41A-30) to continue the activities of the latter. There are no provisions for an end to the activities, no cessation of the existence of parks and recreational facilities, no dismissal or replacement of present employees and no halt to the programs of the Commission. The only difference will be that the board of freeholders will be the final judge rather than the commissioners. The Optional County Charter Law is merely the vehicle which permits the freeholders, the duly elected representatives of the people, to be the final judge in this respect.
[Union County Park Commission v. County of Union, 154 N.J.Super. 213, 231-232, 381 A.2d 77 (Law Div.1976), aff'd o.b., 154 N.J.Super. 125, 381 A.2d 33 (App.Div.), certif. denied, 75 N.J. 531, 384 A.2d 511 (1977) (emphasis added).]
The Judge could have just as easily and appropriately said “no loss or diminution of tax exempt status.” He simply was not called upon, nor was he required to make such a statement in that case.
III.

Applicability of N.J.S.A 54.:£-1.10 and N.J.S.A. 54:4--2.3

Having determined that the applicable exemption statute is N.J.S.A. 40:37-101 and not N.J.S.A 54:4-3.3, I next turn to the exceptions to the exemption. If otherwise tax exempt property is leased, licensed, or used by a non-exempt entity in a profit-making *140 capacity, the property loses its tax exemption. N.J.S.A 54:4-2.3; N.J.S.A 54:4-1.10.
N.J.S.A 54:4-2.3 provides:
When real estate exempt from taxation is leased to another whose property is not exempt, and the leasing of which does not make the real estate taxable, the leasehold estate and the appurtenances shall be listed as the property of the lessee thereof, or his assignee, and assessed as real estate.
N.J.S.A 54:4-1.10 provides:
When real property which is exempt from taxation is used by a private party in connection with an activity conducted for profit, and the use does not render the real property taxable pursuant to section 1 of P.L.1949, c. 177 (C. 54:4-2.3) or otherwise, the real property shall be assessed and taxed as real property of the private party. The private party is subject to liability for taxation to the same extent as though he owned the property or any portion thereof, unless the owner consents to the taxation thereof. For purposes of this act, “use” means the right or license, express or implied, to possess and enjoy the benefits from any real property, whether or not that right or license is actually exercised.
As applied to these cases the two quoted statutes appear to defeat the exemption claimed by Bergen County, on the ground that the private leases of the public parks involved profit-making-entities.
Nevertheless, it is well settled in this State that if a public entity chooses to accomplish a statutorily authorized public purpose by private contract, the public property used to achieve that end will not lose its tax exemption or become subject to tax. Walter Reade, Inc. v. Dennis Tp., 36 N.J. 435, 177 A.2d 752 (1962); In re Appeal of Howard D. Johnson Co., 36 N.J. 443, 177 A.2d 756 (1962); Martin v. Collingswood Bor., 36 N.J. 447, 177 A.2d 759 (1962); Egg Harbor City v. Atlantic County, 10 N.J.Tax 7 (Tax 1988).
As most eloquently stated by Chief Justice Weintraub:
It would be strange for the Legislature to enable the Authority to choose among several modes of rendering this public service and then encumber the choice with tax consequences.
[Walter Reade, Inc. v. Dennis Tp., supra, 36 N.J. at 440, 177 A.2d 752.]
One of the earliest cases relating to this issue is Jamouneau v. Division of Tax Appeals, 2 N.J. 325, 66 A.2d 534 (1949). There, a private tenant leased the city’s tax exempt land to operate a factory for commercial purposes and the tax exemption was *141 denied. In Jamouneau, the tenant had constructed the factory at its own cost but paid rent of 1.13% of the property’s value each year of a 50-year lease. Furthermore, there was a purchase option available to the tenant at any time. Taken together, all the lease terms indicated that the tenant was the beneficial owner of the building. The Court found that the terms of the lease were “evidential of the intent of the parties and of the status of the property with respect to taxability.” Id. at 329, 66 A2d 534. The only governmental function served by the lease was the raising of revenue.
Observing the terms of the lease, the Jamouneau Court concluded that “[t]he use was exclusively private and commercial; there was neither vestige of a present public use nor prospect of a future public use ...” Id. at 330, 66 A2d 534.
The case at hand is readily distinguishable from Jamouneau in three respects. First, the use of the property here is far from exclusively private and commercial. The public citizens and their recreation program are plainly the objects of any privately-contracted services, notwithstanding the limited use of certain facilities such as the horseback riding operation.
Second, the instant matter differs from Jamouneau because this case deals with the tax exemption of a county park, whereas Jamouneau involved a city-owned factory site consisting of land and the commercial structure built upon it. Thus, while Jamou-neau involved the general tax exemption under N.J.S.A 54:4-3.3, and its corresponding requirement that the subject actually be used for a public purpose, this case turns upon the application of N.J.S.A 40:37-101, which specifically applies to county parks and is less restrictive because it merely requires that the subject be made available for public use in order to qualify for tax-exempt status.
Third, we reconcile our departure from our Supreme Court’s 1949 analysis in Jamouneau by pointing out that the Optional County Charter Law, N.J.S.A 40:41A-31, was enacted in 1972, and it construes “as liberally as possible” a county’s right to reorganize its own form of government.
*142 The issue of private operation of leased property was again addressed in Walter Reade, Inc. v. Dennis Tp., supra, and In re Appeal of Howard D. Johnson Co., supra (following Walter Reade on similar facts). In Walter Reade, the Highway Authority licensed a private party to run certain restaurant facilities along the Garden State Parkway pursuant to its authority to contract the operations out to a private party under N.J.S.A 27:12B-1 et seq. The agreement was a license by name, but it was assessed under the lease taxing authority of N.J.S.A. 54:4-2.3. Our Supreme Court explained that such roadside restaurants “are part of the contemplated public use ... notwithstanding a ‘lease’ to a private operator.” 36 N.J. at 439, 177 A.2d 752. The statutory exemption, the Court explained, was not dependent on whether the Authority operated the property for public use directly or by arrangement. The Court relying on “the sense of the situation,” pointed out that any tax imposed on the private party will eventually end up as a burden on the State. The tenant would be willing to pay less rent if it were required to pay the tax, and in effect the Authority would have the amount of the tax taken out of its own pocket. 36 N.J. at 439-40, 177 A.2d 752. See also, Bloomfield v. N.J. Highway Authority, 18 N.J. 237, 113 A.2d 658 (1955) (where a similar service area was found not to be subject to local zoning laws since the state’s position as financial guarantor of the Authority gave the state a direct concern in the profitability of the highway system, and any infringements on that by local governments should not be allowed).
A similar situation existed in Martin v. Collingswood Bor., 36 N.J. 447, 177 A.2d 759 (1962), which held that property of a county park commission, leased to a private operator for operation of a milk bar, remained a public use and therefore could not be burdened with taxation. The park statute authorized the commission to provide or arrange for any facilities for the use and enjoyment of the parks as the authority should find necessary and expedient. Licenses and franchises for private individuals who operated for profit were explicitly allowed as well.
*143 Notwithstanding the fact that the milk bar was a profit-making entity, the Supreme Court emphasized that “[t]he park commission of course is not a profit-making organization. That it may operate a particular facility for a profit does not make the total park operation a business venture.” Martin, 36 N.J. at 451, 177 A.2d 759. See also Hill v. Collingswood Bor., 9 N.J. 369, 88 A.2d 506 (1952).
In Todd Shipyards Corp. v. Weehawken Tp., 45 N.J. 336, 212 A.2d 364 (1965), the plaintiff leased property from the United States for a private business enterprise. The Court found that “[p]rivate interests which benefit from local government should contribute fairly to its cost and ought not to have a competitive advantage a tax immunity would give.” Id. at 340, 212 A2d 364. The Court explained the reach of N.J.S.A 54:4-2.3, the Leasehold Taxing Act, stating that while:
a lease of exempt property for private use would in some cases itself destroy the exemption and lead to taxation under the general tax statutes, the draftsman excluded all such cases and sought to reach only such leases for private use as would not end the exemption under existing law. Accordingly section 1 expressly excludes leases which operate to subject exempt real property to taxation under existing law, and provides for taxation under its own provisions of the leasehold estate in all other cases.
[Id at 342, 212 A2d 364.]
Another case, Egg Harbor City v. Atlantic County, supra, explained that “N.J.S.A. 54:4-2.3 applies to property which is exempt by virtue of its ownership. County owned property must also be used for public purposes in order to be exempt.” 10 N.J.Tax at 16 (citing Essex County v. East Orange, 7 N.J.Tax 346 (Tax 1985), rev’d on other grounds, 214 N.J.Super. 568, 520 A.2d 788 (App.Div.), certif. denied, 107 N.J. 120, 526 A.2d 189 (1987)).
Jersey City v. Jersey City Parking Authority, 138 N.J.Super. 442, 351 A.2d 377 (App.Div.) aff'd, 71 N.J. 492, 366 A.2d 648 (1976), is a ease where the court found legislative intent in a specific exemption statute to allow the public authority to hold property by lease and still qualify for the tax exemption. There, it was the use of the property which made the property exempt, rather than the tax status of the owner. The parking authority had leased certain lands from a private party for $1 per year and a *144 promise that any property tax due would be paid by the Authority. The Authority was given statutory authority to enter into a lease for property, and any property so held would be exempt, although the Authority was also free to arrange to pay the municipality for any services provided.
The effect of N.J.S.A 54:4-1.10 on leases of exempt realty by private parties was discussed in N.J. Highway Authority v. Bloomfield, 8 N.J.Tax 637 (Tax 1987). There, Judge Crabtree explained the inapplicability of the statute, which assessed the value of otherwise exempt realty used by a private profit-making tenant against that tenant. As Judge Crabtree stated, “[t]he legislative statement makes it clear that the statute [N.J.S.A. 54:4-1.10] sought to close a loophole in current law, which provided that exempt property leased to a non-exempt party was taxable but if the same property were used under a non-lease arrangement, the exemption was preserved.” N.J. Highway Authority, 8 N.J.Tax at 641-42. Since the property would have been exempt but for calling the arrangement a lease, then, conversely, it is not exempt simply because the tenant had leased rather than licensed the property.
In Egg Harbor City v. Atlantic County, 10 N.J.Tax 7, 12-17 (Tax 1988), Judge Rimm thoroughly and exhaustively discussed the impact of N.J.S.A 54:4-2.3 and N.J.S.A 54:4-1.10 on the taxation of county owned property. He concluded that these statutes result in the taxation of county property leased to a taxable entity if the purpose of the lease is to serve a private purpose.
In this case, the facts demonstrate that the purpose of the county’s leases to the two concessionaires was to carry out a county function previously directly undertaken by the county. After the evaluation conducted subsequent to the 1985 grand jury investigation I must conclude that Bergen County determined that the stable operations in the two county parks would be better handled by engaging concessionaires. This determination to have a county function managed by a concessionaire rather than by the *145 county directly does not convert the county purpose to a private purpose.
The principal basis for the municipalities’ claim that the exemption is lost is the restriction on access to the facilities. Those cases in which publicly owned land has lost its exemptions are those in which the use of the property served no public purpose other than the raising of money for-the public entity. Essex County Park Commission v. State Bd. of Tax Appeals, 129 N.J.L. 336, 29 A.2d 739 (Sup.Ct.1943); and where the standard for exemption was public use rather than the less restrictive public access. Jamouneau v. Division of Tax Appeals, supra.
Such a lack of public access does not exist here. The record adequately establishes that the two riding facilities in question were open to the public and were part of a comprehensive overall recreation plan in Bergen County. What may trouble the municipalities in which the facilities were located is the appearance that use of certain facilities was restricted to the limited number of individuals who are interested in and can afford horseback riding. While there may be some validity in the argument, nevertheless, this shortcoming does not signify the absence of public access in the operation of these facilities or a denial of access sufficient to defeat the tax exemption provided by N.J.S.A 40:37-101. Indeed, exemptions favoring governmental entities should be liberally construed. Walter Reade, Inc. v. Dennis Tp., supra, 36 N.J. at 440, 177 A.2d 752 (citation omitted).
IV.
In summary, I find that the exemption statute to be applied in these cases is the statute applicable specifically to county parks (N.J.S.A 40:37-101) because it applies to parks owned directly by counties which have taken over the property and assumed the functions of the county park commission, pursuant to the Optional County Charter Law. I find that the two riding facilities provided for public access within the meaning of the applicable tax exemption statute. Finally, I find that the statutes authorizing the taxation of exempt property leased to or used by nonexempt *146 parties do not apply to the property in these cases absent a showing that the property serves no legitimate county function other than the raising of revenue.
The Court will enter judgments canceling the assessments which are the subject of these appeals.